Nat H. Hentel, J.
This is an action, tried before the court without a jury, for an alleged breach of a contract for work, labor, and services rendered.
The plaintiff alleges in its complaint that it performed certain work and labor and furnished materials necessary for the maintenance and cleaning of the heating boiler, furnace, and chimney in a certain apartment house located at 1901 Ocean Parkway, Brooklyn, owned by the defendant and at the defendant’s request. The demand is for the sum of $1,100, plus interest and the costs and disbursements of this action.
*1041 The plaintiff’s bill of particulars alleges that two of the plaintiff’s employees worked for nine hours each on October 30, 31, and November 1, 1967, and that three of its employees worked for nine hours each on November 2 and 3, 1967, pursuant to the alleged contract. The plaintiff further alleged in its bill of particulars and testified at the trial that the agreed-upon compensation for these services was in the sum of $220 for each of the aforesaid days, or $1,100.
At the trial, plaintiff presented its case by calling as witnesses : Hyman Cohen, the present vice-president of the defendant ; Eonald J. Hartig, the president of the plaintiff corporation; Thomas Mazzolla and Peter Viskoc, two of the former employees of the plaintiff who worked on this job; Marco Zalta, a former member of the defendant’s board of trustees; and Isidore 'Dayan, the present president of the defendant congregation.
The court is satisfied from the proof adduced at the trial that the defendant is a duly authorized religious organization organized under the laws of the State of New York, and which has been in existence since 1925. The Ahi Ezer Congregation, through its subsidiary creature and corporation, Ahiez Corporation, was, in 1967, and is presently, the fee owner of the premises located at 1901 Ocean Parkway, Kings County.
Sometime in the latter part of October, 1967, the plaintiff was apprised by National Fuel Oil 'Corp., the fuel servicing organization supplying 1901 Ocean Parkway, through one Sidney Wolf, that the boilers and chimney in 1901 Ocean Parkway were in need of servicing and repair and, accordingly, the president of the plaintiff corporation telephoned one ‘ ‘ Marco ’ ’ at the recommendation of the fuel servicer, inasmuch as ‘1 Marco ’ ’ had been represented to the plaintiff by the recommending agency to be the ‘ ‘ agent and superintendent ’ ’ of the defendant at the specified premises.
The plaintiff’s president testified that, on the basis of this telephone conversation with the individual known as ‘ ‘ Marco ’ ’, an oral agreement for work, labor, and services was arranged, and thereafter, he dispatched two of his employees who worked at the subject premises on October 30, 31, and November 1,1967, and further that he had three employees working at the subject premises on November 2 and 3, 1967. It is admitted that the arrangements were made solely via telephone and that the plaintiff’s president never saw “ Marco ” and could not otherwise identify him except by name. The plaintiff president testified that ‘ ‘ Marco ’ ’ told him on the telephone that he was agent for the building.
*1042 Mr. Mazzolla testified that, on the four days he was present while on this job, an individual, whom he pointed out in court, was present on parts of the said four days while the work progressed. The individual he identified in court was named “Marco Zalta.” Mr. Mazzolla said that Mr. Zalta had told him, if he had any difficulties on the job, “ ask for Marco” (although he did not know Marco’s last name while on the job), and further that Marco had told him that he was the “ landlord’s foreman.” Later in his testimony, Mr. Mazzolla stated that he first saw “ Marco ” on the first day of the job, October 30,1967, and that ‘ ‘ Marco ’ ’ notified him and Pete Viskoc, his fellow employee, that he 1 ‘ was the landlord ’ ’ and explained to them what had to be done, and then advised them that his name was “ Marco and I’ll be around.”
The foreman of the plaintiff’s job, Peter Viskoc, testified that he was present on all five days during which the plaintiff performed its services for the defendant and that he had Mr. Mazzolla working with him for four days, and .that another employee joined them on the last two days of the job. He, too, testified that he spoke to “Marco” while performing services at the subject premises and that he had asked “Marco ” where the superintendent was. “Marco” told Mr. Viskoc that he was the superintendent and then instructed Viskoc and Mazzolla to “ clean out all the accumulated soot in the boiler room, to remove broken fire-brick in the chimney breaching ”, and further advised them that he “had to have the boiler room cleaned.” Mr. Viskoc also testified that he saw “Marco”, whom he also identified in court as the individual known as Marco Zalta, several times a. day while on the job and that “ Marco ” had said to him at the end of the job, “ it was very good the way you cleaned it.” In fact, Mr. Viskoc said that “ Marco ” wanted him to take care of the building across the ■ street and attempted to recruit him as superintendent for that building.
The plaintiff’s president testified that the agreed-upon price for the services to be rendered was $25 per hour for two men, plus the use of the plaintiff’s half-ton truck. Mr. Hartig admitted that he had no personal knowledge of the actual time worked by his employees on this job. Mr. Mazzolla stated that when he came on the job, soot was piled up all over the boiler room and that he and Mr. Viskoc took out between 450 to 500 paper bags of soot, and also took out broken bricks comprising some 12 to 14 truckloads which they dumped in Jamaica, Queens County. The paper bags were described as 100-pound, double- *1043 layer bags, 4 by 2 feet, which were filled approximately one half to three quarters of capacity.
Mr. Mazzolla’s testimony was corroborated by Mr. Viskoc, who testified that when he first came on the job, he saw soot piled up inside the pit housing the boiler, all around the boiler and on the ledge surrounding the boiler. He also testified that he and his fellow workers filled about 450 double-layer paper bags which they loaded on the half-ton truck to the extent of some 25 to 30 bags on each load. Upon cross-examination, Mr. Viskoc stated that the boiler pit was approximately 3 to 4 feet deep and one foot wide around the edges of the boiler, and that soot completely filled the pit and “ ran all the way up the wall.”
The plaintiff also introduced in evidence a New York City housing violation filed for the subject premises on or about June 10, 1966, for failure to maintain the boiler room cellar in a clean condition.
Mr. Cohen, a vice-president of the defendant congregation, acknowledged the defendant’s ownership of the apartment house in question in 1967, and that the defendant still owns the building. Further, he stated that Mr. Zalta was a member of the board of trustees of the defendant in 1967, but was not ‘ ‘ agent for the building.” He admitted that Mr. Zalta was authorized to order fuel oil for the building but claimed no knowledge of the 1967 boiler-cleaning or soot-removal situation. Further, he claimed that the board of trustees of the defendant never authorized any expenditure of the congregation’s funds for such purposes in 1967. He described Mr. Zalta as recording secretary of the congregation and co-chairman of the building committee for 1901 Ocean Parkway in 1967.
The plaintiff called as its own witness at the trial Mr. Zalta, who testified that he had not been employed by the defendant in 1967, but that Mr. Dayan, then and still the president of the congregation, had “ asked him to look after 1901 Ocean Parkway.” Mr. Zalta denies under oath having had any conversation either on the telephone or in person with Messrs. Hartig, Mazzolla, or Viskoc. He recalled seeing soot being removed at the time in question from the boiler room of 1901 Ocean Parkway, and he also saw cleaning operations going on. In fact, he recognized Mr. Viskoc from his personal confrontation in court at the trial. He admits that during the period October 30 to November 3, 1967: “ I must have told them to do something.” He also admits that he was a member of the house committee for 1901 Ocean Parkway in 1967, and that he did repair work in the building himself but denies that he ordered such fuel oil *1044 for the building, and claims that the superintendent ordered such fuel oil. On further questioning, he admits having spoken to Mr. Yiskoc, and admits having had conversations, on occasion, with National Fuel Oil Corporation, and further that Mr. Yiskoc told him that he was from the ‘ ‘ chimney cleaning company. ’ ’ His testimony later developed the fact that on the first day of the job (Oct. 31, 1967), he saw men “ bringing in big large shopping bags — double bags — and that men took out bags filled with soot to a truck ”; and that he saw the “ men carrying out a few bags ” at the conclusion of the job, when he further testified that ‘‘ the chimney was cleaned out ’ ’, but that the job was not finished, and that he “.told the office (of the defendant) not to pay the bill, because there was a little bit of soot around the chimney.” He further admitted that the National Fuel service man told him ‘ ‘ it (boiler, chimney) was choked up in October 1967 ’ ’, and that a ‘ ‘ Mr. Schoenberg sent them down.” He was not sure, however, whether National Fuel sent down the plaintiff or an organization identified as ‘ • Kent Boiler Cleaning Company.”
On cross-examination by the defendant’s attorney, Mr. Zalta admitted that some soot had been taken out “ during the period indicated ”, and that he was present on the morning of the first day of work; and that he 1 ‘ was walking in and out of the boiler room during those days; that soot was there; that he saw soot and stuff laying around; that soot was around the boiler to the extent of a barrel or two; that, on the last day of the job, he was present and saw that some soot had been taken out; most of the soot had been taken out; a barrel or two of soot had been removed.” He further testified on cross-examination that he had 1 ‘ learned to shut up when a man asks for money and not to complain about poor work.” He admitted that the chimney ran for four floors and that if the chimney had been cleaned all the soot would come down, and that National Fuel had, in fact, advised him that the said chimney was all cleaned up.
Defendant’s president, Mr. Dayan, testified that Marco Zalta was in charge of 1901 Ocean Parkway in 1967. He further testified that the defendant’s board of trustees had “never enacted a written resolution, memorialized in the minutes of the Congregation, limiting the amount of any expenditure to be made without prior approval of the Board.” He said that the president of the congregation had been granted the authority to spend up to $50, and that he had not given Mr. Zalta any authority even to make such an expenditure.
The defendant’s case consisted of calling Albert Brown, a former handyman and superintendent of 1901 Ocean Parkway, *1045 who had left the employ of the defendant at Christmas time, 1965. Mr. Brown testified that he had visited his place of former employment in July, 1967, and in January, 1968, and that on neither occasion did he see any soot in the boiler room. It is to be noted that Mr. Brown had not visited the premises in October or November, 1967.
The attorney for the defendant took the stand himself, and completed the defendant’s case by testifying that the “ Defendant had been billed by the Plaintiff via its letter of November 15, 1967, and again on July 8, 1968.” He stated that the plaintiff’s bill had been referred by him to Rabbi Wolf of the defendant congregation, and that “ the amount of the bill was contested on the ground that the work had not been completed and, accordingly, the bill was not paid. ’ ’
Preliminary to the trial, the defendant had merely interposed a general denial by way of its answer, and no affirmative defenses. Furthermore, the filed preliminary motion papers in this action indicate that the parties had entered into an oral agreement on an earlier trial date in this court on August 6, 1969, wherein the “ defendant was to pay to the Plaintiff the sum of $650, in full and complete settlement of all causes of action upon the receipt of a general release and stipulation of discontinuance.” It appears that the settlement agreed upon was never consummated because of some claimed technical deficiency in the release prepared by the plaintiff and submitted to the defendant who rejected same. The result of the failure of the parties to effectuate their oral agreement of settlement of August 6, 1969, is the present trial which was held on February 10 and 17, 1970. Although the filed papers referred to above were not alluded to in the trial or otherwise read into the record, nevertheless, it is this court’s opinion that they are part of the public record in this action, and are of probative value in determining this dispute, and should be taken into account by the court. It' is noted that the defendant had never denied any of the allegations concerning the proposed settlement of this matter as alleged above.
At the conclusion of the trial, the defendant’s attorney moved to dismiss the plaintiff’s complaint “ for failure to sustain its burden of proof by a fair preponderance of the credible evidence, ’ ’ upon which motion the court reserved decision.
Further, the defendant interposed, as an affirmative defense at the conclusion of the trial, the provisions of section 5 of the New York Religious Corporations Law, under which authority it is claimed that any expenditure of the defendant’s funds had to be approved by the defendant’s board of trustees; and that *1046 no such approval or authorization was shown or obtained here.
The defendant further relies upon Hickey Co. v. Bobover Yeshiva B’nai Zion (N. Y. L. J., Dec. 15, 1969, p. 15, col. 7), wherein the Appellate Terra of the Supreme Court for the Second and Eleventh Judicial Districts unanimously reversed a judgment in favor of the plaintiff and dismissed the complaint saying: ‘ ‘ Defendant * * * is a religious corporation, consequently, the burden was upon the * * * plaintiffs to prove that Rabbi Landau was duly authorized at a regular meeting of the board of trustees of the defendant corporation to enter into the agreements in writing sued on (Krehel v. Eastern Orthodox Catholic Church in America, 22 Misc 2d 522, affd. 12 A D 2d 465, affd. 10 N Y 2d 831; Matter of Congregation Anshe Kesser, &c., 5 A D 2d 1011, 1012-1013 [2d Dept.]). Since it clearly appears that the * * * plaintiffs did not present such proof upon the trial, they did not establish a prima facie case (Westchester Mtge. Co. v. McIntire, 174 App. Div. 446, 447 [2d Dept.]).” On the basis of this case, the above-noted section of the Religious Corporations Law, and the proof, the defendant in this case claims that, even if all the work alleged had been performed by the plaintiff, in the absence of proof of an express authorization for the work by the defendant’s board of trustees, the plaintiff cannot prevail. See Matter of Congregation Anshe Kesser (Jewish Community Center) (5 A D 2d 1011, 1012 [1958]) which holds that “ [the property of a religious corporation] is in the custody and control of its board of trustees [and] Neither its trustees nor its other officers have separate individual authority to bind the corporation [since] Collective action as a board is necessary.” (Emphasis supplied.)
The court, in rendering its decision, will overlook the fact that the defendant did not assert the affirmative defense of its being a ‘ ‘ religious corporation ’ ’ in its pleadings which only consisted of a “ general denial ’ ’ and a demand for a bill of particulars. Instead, the court will proceed on the basis that section 5 of the Religious Corporations Law had been pleaded timely and will make its decision on whether or not this is a meritorious defense in this proceeding.
Let us look at the pertinent provisions of section 5 of the Religious Corporations Law. It says: ‘ ‘ The trustees of every religious corporation shall have the custody and control of all the * * * property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance with the discipline, rules and usages of the corporation * * * and with the provisions of law *1047 relating thereto, for the support and maintenance of the corporation, * * * and they shall not use such property or revenues for any other purpose or divert the same from such uses. * * * they may also, in their discretion, delegate and grant to the trustee or custodian designated by them all or any portion of the powers, responsibilities and discretionary authority possessed by them with respect to the retention * * * of such property or any part thereof ”. (Emphasis supplied.)
Let us further look into the legislative purpose behind the enactment of the Religious Corporations Law. “ The primary purpose of the Religious Corporations Law is to provide for an orderly method for the administration of the property * * * dedicated to the use of religious groups and to preserve them from exploitation by those who might divert them from the true beneficiaries of the trust.” (St. Nicholas Cathedral v. Kedroff, 302 N. Y. 1, 29 [1950].)
Now to cite two other principles of law which this court believes to be applicable in this case: 1. “ Religious Corporations are governed by the same general rules of law and equity as other corporations. (Wilson v. Tabernacle Baptist Church, 28 Misc. 268, 269 [1899]. Emphasis supplied.) 2. The powers of trustees of any church organization or religious society * * * were subjected to the control of the courts of equity so far as" was necessary to enforce the provisions of the act. (People ex rel. Peck v. Conley, 42 Hun 98 [1886], emphasis supplied).”
By no stretch of the imagination, can the principles of law and equity be stretched in turn to permit the working of a manifest injustice. The court cringes from applying the narrow interpretation of the meaning of section 5 of the Religious Corporations Law espoused by the defendant in this matter. To apply the narrow interpretation would be to allow, by court sanction, any religious corporation the unfair advantage of an unjust corporate shield etched with religiosity, whereby the corporation could then unjustly enrich itself at the expense of unsuspecting and unwary merchants, purveyors, and service agencies. To sanction such an application is abhorrent to this court. The purpose of the section in question is to “ preserve [religious corporations] from exploitation by those who might divert [the corporate property] from the true beneficiaries of the trust.” (St. Nicholas Cathedral v. Kedroff, supra, p. 29.) Granting this to be true, by the same token, this law is not meant to gain for the said beneficiaries the continued use of that reasonable portion of their property which has been or should have been dedicated on their behalf for the maintenance and *1048 preservation of their property and its income-producing potentials. Here, the usual rules of law and equity will be applied as a force paramount to the rights of the defendant’s board of trustees under the Religious Corporations Law, whether or not there has been a specific resolution, enactment or authorization of the board in 1967 for boiler and chimney cleaning and repair for 1901 Ocean Parkway.
Courts will imply a contract where there is none in writing, but where the actions of the parties relate to a contract and where there is a benefit conferred to one party by the actions of the other. (Gillan v. O’Leary, 124 App. Div. 498.) The doctrine of unjust enrichment is not contractual, but is equitable in nature, and a quasi- or constructive contract, once it has been spelled out by the facts of each case, rests upon the equitable principle that a person [corporation] shall not be allowed to enrich himself unjustly at the expense of another. (Matter of Phillips, 10 Misc 2d 714.) Whether or not the defendant is a religious corporation does not alter this equitable doctrine, since a religious corporation has no greater rights, in law or equity, than any other individual with respect to the doctrine of unjust enrichment.
From all of the factual circumstances adduced at the trial, and which this court as the trier of the facts finds to be credible, the court finds that a contract between the parties .was constructively spelled out and agreed upon by the very actions of the parties herein. The plaintiff did in fact render certain services, and supplied materials and labor from October 30 through November 3, 1967, at the premises 1901 Ocean Parkway owned by the defendant. The apartment building in question is a commercial enterprise providing profit and income-producing potential for the beneficiaries of the trust property — the congregants of the defendant. The rewards of income and profit potential derived from property ownership also require that the owner of property must assume certain responsibilities and obligations of maintaining such property in a safe and healthful manner on behalf of rent-paying tenants. It is clear that heating and supplying hot water is an essential element of the contract between landlord and tenant. Thus, the defendant here had a clear obligation to undertake necessary boiler and chimney repairs and cleaning in order to maintain the heat-producing capabilities of its building. It is beyond comprehension to think that such an obligation could be carried out without an expenditure of the defendant’s funds. The facts, recited earlier in this decision, clearly establish, at least to this court, that by custom and ordinary usage the defendant’s board *1049 of trustees had, in fact,1 ‘ delegated and granted to the trustee ’ Marco Zalta, their “ powers, responsibilities and discretionary-authority ’ ’ with respect to 1901 Ocean Parkway. The fact that the board’s agent, trustee Marco Zalta, did not disclaim, protest, reject or stop the plaintiff’s employees from working on the premises; the fact of his conversations with Messrs. Mazzolla and Viskoc, the plaintiff’s employees; the fact that the knowledge of the work being performed by the plaintiff was known to Marco Zalta, which knowledge, as a matter of law, is imputed to the defendant, since Zalta was a trustee of the defendant; the fact that the defendant’s attorney did not disclaim or reject in writing the plaintiff’s bills for services rendered but instead ignored them (which is ratification by the acquiescence of silence) and testified that he recommended that the bills not be paid because the work had been completed imperfectly; the fact that the defendant had, in fact, agreed to pay the plaintiff $650 (which is recognition partially of the validity of plaintiff’s claim) and then failed to pay same after a pretrial settlement had been worked out by the parties in court; and all of the other circumstances herein — all spell out, under equitable considerations, that a binding contract had been established between the parties with the same force and effect as if it had been in writing and subscribed by an officer or trustee of the defendant corporation pursuant to explicit authorization from the defendant’s board of trustees. The court holds that constructive authorization of the defendant’s board of trustees for the work, labor and services performed by the plaintiff herein has been established by the defendant’s course of conduct. To hold otherwise, would do violence to all ethical, equitable, moral and legal concepts and would make ‘1 unjust enrichment ’ ’ a much sought after prize by religious corporations in their dealings with unsuspecting and unsophisticated suppliers of labor and materials. The court cannot in good conscience permit this result. The law does not and cannot require a court to embellish an injustice with an additional injustice, despite the claimed protective law umbrella a religious corporate defendant seeks to huddle under as a defense against the wetting rain of actual or constructive contractual obligations. The defendant should be and is hereby equitably estopped from asserting its claimed defense under section 5 of the Religious 'Corporations Law.
Accordingly, the court denies the defendant’s motion for a dismissal of the complaint and grants the plaintiff’s end-of-trial motion for judgment on the pleadings.
*1050 The question is now, how much to award the plaintiff?' Whereas the testimony relating to the circumstances spelling out an agreement between the parties met the tests of “ fair preponderance” and “ credibility ”, the testimony is not as convincing or credible concerning the removal of some “ 450 to 500 paper bags ” of soot comprising some “ twelve to fourteen truckloads ” from the 1901 Ocean Parkway premises, and also with respect to the actual number of hours worked on five days by two and subsequently three employees. The testimony in this area was not enhanced when the plaintiff’s president, who testified in consonance with the complaint and the bill of particulars on February 10, 1970, then later testified, on being recalled on February 17, 1970, that his earlier testimony was wrong in that it was based on his recollection of a job performed at an entirely different location than 1901 Ocean Parkway, and that he had no present recollection of visiting the subject premises. He could only corroborate on recall that he had purchased ‘ ‘ 500 paper bags ’ ’ for the removal of soot from the defendant’s premises and that his employees had advised him that approximately 450 bags of soot and debris had been removed from the subject premises.
Under these circumstances, and based upon the testimony of Messrs. Mazzolla and Viskoc, and the fact that the defendant had been willing previously to compromise the plaintiff’s claim in August, 1969,.for the sum of $650, the court will give credit to the plaintiff for the minimum number of bags per truckload claimed to have been transported from the defendant’s premises. Messrs. Mazzolla and Viskoc testified that they removed some “ twenty-five to thirty bags of soot per truckload ”, and that they removed some ‘ ‘ twelve truckloads. ’ ’ Taking the minimum, this would mean that they had removed some 300 bags of soot and debris over a five-day period rather than the claimed rmninmm of 450 bags of soot and debris. A mathematical ratio between the bags claimed and bags minimally removed under the employees’ testimony would then fix the reasonable monetary value of the plaintiff’s services, using the $1,100 figure claimed for removing 450 bags of soot and debris. Since 300 bags is one third less than the 450 bags claimed, the court will allow to the plaintiff approximately two thirds of the $1,100 claimed, or $750 in round figures, with interest thereon from ■ November 15, 1967, plus the costs and disbursements of this action. Enter judgment accordingly.