Joseph Liff, J.
We have two actions which have been joined for trial. A plaintiff in the first action, the Russian Church of Our Lady of Kazan, is a religious corporation created in 1942 under then article 5-B, now article 5-A of the Religious Corporations Law of the State. Its place of worship is at Sea Cliff, New York. The remaining plaintiffs are the Rector, Trustees and other officers of the church corporation who brought this action on behalf of the corporation claiming they are its duly elected Trustees, etc., and that the defendants unlawfully usurped their functions and ousted the corporation from the church and its properties. They seek a judgment to remove the defendants from the church property, declaring that plaintiffs are the only duly elected Trustees of the corporation, restraining the defendants from interfering with them in the performance of their duties and from interfering with the conduct of worship services by the plaintiffs in the church property, awarding damages for the alleged wrongful acts, and other related relief.
The defendants in the first action, Andrew Dunkel, et ah, brought the second action, now as plaintiffs, joined with them the church corporation and named as defendant solely the Russian Orthodox Greek Catholic Church of America, which is described in the title of the action as “ also known as the [1] Metropolia ’ and its successor the Orthodox Church in America.” In this second action they ask a judgment declaring that they are the duly elected officers, that the Parish is not required to submit to the hierarchal control of the Metropolia, and for relief which would free the corporation, the church, and its parishioners from any agreement made by the Metropolia with the Patriarch in Moscow whom they describe as [11] claiming ’ ’ to hold that office. The request that the Church be adjudged free of the hierarchal control of the defendant Metropolia presents another phase of the principal issue in this case.
The defendants in the first action for their denials, defenses and counterclaims have set forth in substance the same matter which provides the basis for the relief they request as plaintiffs in the second action where solely the Metropolia is named defendant. Therefore, we will designate the plaintiffs in the first *1034 action by that term and whenever we refer to “ defendants ” we intend to include the defendants in the first action and plaintiffs in the second action, and the defendant in the second action will be described as the ‘ ‘ Metropolia ’'.[1]
Plaintiffs sought and obtained a temporary injunction (order of Mr. Justice Widlitz, March 25, 1970). In his memorandum decision of March 20, 1970, Judge Widlitz said “ By incorporating under the provisions of then Article 5-B (now Article 5-A), the Church and its Trustees acknowledge that they are affiliated with and subject to a church at large.”
He also said that even if the meetings called by defendants “ were properly called, the Trustees could not propose By-laws that would alienate the Church from its affiliation with the Russian Orthodox Greek Catholic Church of America-. ’ ’ [Citing Trustees of Presbytery v. Westminster Church, 222 N. Y. 305, 321.]
On appeal from that order, the Appellate Division (34 A D 2d 799, 800) said that: “Where church members seek to effect a transfer of church property from the control of one hierarchy into the hands of a competing hierarchy, the courts will award the use and control of the property to that faction which remains loyal to the denominational or ecclesiastical hierarchy into which the parish was incorporated-. ’’ [Citing Watson v. Jones, 80 H. S. 679.]
The appellate court, prescribing the issue to be decided at trial, held (p. 801) that: “ the key question as to which of the two hierarchies, the Metropolia for the Synod of Bishops of the Russian Church in Exile, was the supreme ecclesiastical body by which this parish was to be governed when it was incorporated” could not be determined on affidavit alone but required a trial at which the factual questions could be explored.
The plaintiffs allege (complaint, [[ 7) that the Parish was incorporated as a constituent part of the Metropolia. The defendants answering (H seventh) deny that the Parish had ever been incorporated into a ‘ ‘ purportedly independent Metropolitan district. ’ ’ They assert that when the Parish was incorporated in December, 1942, it became a part of the Russian Orthodox Greek Catholic Church of America which, they allege, *1035 was then being administered by the Council and Synod of Bishops of the Russian Orthodox Church outside of Russia.[2] The rationale for this allegation is that although the Metropolia had a valid existence as a diocese of the original church in Russia, after the diaspora the highest[3] authority for the church became the Synod of Bishops, first organized in southern Russia early in the second decade of this century. Moreover, they argue that in the mid-1980s, pursuant to a set of Temporary Statutes, the Metropolia yielded its independence, was merged into the Synod of Bishops, ceased to have a separate existence and became subservient to the Synod. They allege that those who pretend to be the Metropolia are “ a non-canonical group of persons.” (1f “ eighth ”, defendants’ answer).
Thus the crux of this case and what the Appellate Division called “the key question” is “which of the two hierarchies, the Metropolia or the Synod of Bishops of the Russian Church in Exile, was the supreme ecclesiastical body by which this parish was to be governed when it was incorporated. ’ ’ (Russian Church of Our Lady of Kazan v. Dunkel, 34 A D 2d 799, 801). The issue has been affected by the claim of the Dunkel group, supported by the Synod of Bishops, that, although the Parish was incorporated into the Metropolia, since the Metropolia itself had been merged into the Synod of Bishops, all parishes, temporalities, etc., etc., of the Metropolia, including the Lady of Kazan, became part of an hierarchal church structure to which it acknowledged its subservience.
In reviewing the order which granted the temporary injunction in this action, the Appellate Division remarked: ‘‘ The historical background of the Russian Orthodox Church has been well-documented (see St. Nicholas Cathedral v. Kedroff, 302 N. Y. 1, revd. sub nom. Kedroff v. St. Nicholas Cathedral, 344 *1036 U. S. 94; Russian Orthodox Church v. Lisen, Superior Ct., Los Angeles County, No. 536524, dec. Nov. 29, 1948. ”[4] Therefore, this Court will not attempt to trace the entire history of this Church but will confine itself to those events which bear on the issue.
The question presented by the Appellate Division will be answered in the light of the recent history of the Church. We must therefore review what occurred after many of the clergy of various rank were forced to flee Russia. The origin of the Church in North America (the Metropolia), has been described in the decisions of other courts and will be referred to again here. The Metropolia which had been a diocese of the Church in Russia, declared its autonomy in 1924. There were and continue to be in this country independent parishes which acknowledge the authority of the Moscow Patriarch, and still others which gave allegiance solely to the Synod of Bishops. Each faction sometimes refused to acknowledge and often disputed the canonicity of the others. The present controversy was initiated by other circumstances (the application for autocephaly which we will come to presently) but it must be resolved by a decision on whether the American Church, i.e., the Metropolia, ever ceased to have an independent existence and became subservient to the Synod.
Early in the trial the Court several times expressed the wish that the dispute might be resolved and a reconciliation effected. It became apparent only after many days of hearing evidence and the receipt of more than 200 exhibits that we had an insufficient understanding of the irreconcilable conflicts which ran deep and which were far beyond the powers of this Court to compromise. There were no doubt acts which would have indicated a rapprochement between the Synod and Metropolia, but although attempts were made, the opposing views of the parties prevented them from reaching that meeting of the minds which is necessary to the consummation of an agreement.
Although there was agreement in many areas the parties never reached that ‘[1] finality of assent ’ ’ which is essential to the mak *1037 ing of a consensual agreement. In all discussions there remained fundamental disputes which were never adjusted (PBA v. City of New York, 27 N Y 2d 410, 415).
The principal differences which could not he resolved were with regard to the participation of laity in the affairs of the Church and the insistence on autonomy for itself which the Metropolia desired and the clash of these concepts with the philosophy of church governance held by the Synod. This position of the Metropolia runs throughout its negotiations with the Synod.
Therefore, there remains for us the need to determine the issues between the parties. The limitation imposed upon the Court in facing such a task was eloquently described by then Judge Charles S. Desmond in his dissenting opinion in St. Nicholas Cathedral v. Kreshik (7 N Y 2d 191,221): ‘1 No Judge of this court is unaware of the professed atheism of communism or of the antireligious bias and activities of the Communist rulers or of the U.S.S.R. Bach of us as an individual deplores and abhors the cruel attacks of the Communist regime on religious institutions and on their clergy and communicants. But we sit here as a court deciding a lawsuit. The same jurisdictional and substantive rules control in this case as in every other one we hear.” Other considerations must be laid aside and the actions determined on the findings of fact and in the light of applicable law.
The growth and life of the Church had been uneven before the Russian Revolution of 1917. For a great deal of its canonical law the Church looks to the seven Ecumenical Councils, the last one of which was held in the eighth century. Early in the eighteenth century, because he desired more complete control of the Church, Tsar Peter the Great (1689-1725) abolished the office of Patriarch (Head of the Church) and the Church was without one for some 200 years. In 1917, with the overthrow of the Tsar, the Church encountered other difficulties and uncertainties. Its clergy were scattered as were many of its congregants. The Church was released now from the rule of the Tsars, but still apprehensive of the future, Tikhon was chosen Patriarch by an all-Russian Sober (a council of the Eastern Orthodox Church). For a brief time he was the administrator and guiding spirit of the Church, but the turmoil and the repressive new regime in Russia curtailed the Patriarch’s freedom of action. Confronted with the threat to the Church and his administration and visualizing still greater interference, in November of 1920 he issued Ukase No. 362 (exh. L) which provided that (1) if the highest church administration were unable to function, a Diocesan Bishop would communicate 11 with the Bishops of his *1038 neighboring Dioceses for the purpose of organizing a highest instance of Church Authority for several dioceses which would find themselves in similar conditions ” and (2) if it were impossible to establish contact with the neighboring dioceses, the Diocesan Bishop would assume hierarchal power in keeping with Church canons. All action was to be submitted for confirmation when the central church authority was re-established.
To understand how the Parish was affected by the actions and relationships of the Metrópoli a and the Synod, we must review the history of all three.
In 1794 the Mother Church in Moscow sent a mission to Alaska and the Aleutian Islands. As this continent was colonized, the church grew; its influence extended down the west coast of North America and from the Pacific eastward across Canada and the United States. In time it' became a diocese of the Russian Church. By 1924, four years after Tikhon’s Ukase 362, Soviet control of the original Church hampered communication. In that year, fearing that the Church in Russia was no longer independent, the Metropolia, though continuing to acknowledge the Moscow Church as its spiritual head refused to accept its administrative authority. In the resulting uncertainty the Russian Orthodox Greek Catholic Church was without a central authority.
The Bishops, who later formed the Synod of Bishops outside of Russia, fled Moscow, to escape the persecution which they feared, and found temporary refuge in southern Russia. The archpriest, Father George Grabbe,[5]
[6]in his testimony referred to the Synod as having come into existence out of necessity. The winds of fortune forced the Synod from one locality to another. Finally, in about 1921, Yarnava, Patriarch of the Serbian Orthodox Church, invited the Synod to take up residence in Sremski-Karlovtsy, Serbia. From its beginnings the Synod sought to exercise authority over all adherents of the Russian branch of the Orthodox faith outside Russia and initially took its authority from Ukase No. 362.®
Within Russia the church administration was struggling for existence. Members of the clergy were imprisoned, a number were executed and church property was confiscated.
*1039 In 1922, in Ukases No. 347, 348 and 349, Tikhon decreed that the highest church administration, the Synod Abroad, was abolished (exh. M [1]). The wording of these instruments indicates that he was displeased with the political activity of the Synod. The Synod and its partisans question the validity of these decrees claiming, quite understandably, that the Patriarch acted under duress. They rely on the “ Colton letter ” (exh. X) but that letter pre-dated Ukase No. 349. Nevertheless, the Synod of Bishops recognized these orders and terminated the Highest Church Administration and resolved to call an all-Russian Sobor abroad in November 1922 to organize a new Highest Church Authority (exh. II-l).[7]
Russia continued in turmoil and Patriarch Tikhon, wishing to provide for the continued administration of his office in the event of his inability to act freely or his death, appointed three members of the clergy as Locum Tenens to administer his office until his successor was elected. One of these, Peter, upon Tikhon’s death in 1925 became head of the church administration. Peter in turn named three as Locum Tenens prior to his imprisonment. Sergius, one of the three, came to terms with the Communists. He pledged the loyalty of the church to the government and requested those abroad to acknowlege the Communist government. Because of this action, the Synod of Bishops refused to recognize him as successor to Peter and head of the Church (exh. NNN). This was the setting from which arose the conflict which followed in the Russian Orthodox Greek Catholic Church outside Russia.
The Synod of Bishops and the Metropolia, both beyond the Russian boundaries, each sought to strengthen its position. Long before the present controversy arose, the Metropolia, in strongest language, rejected the claims made upon it by the Synod. Its Sobor of Bishops asserted that the spiritual head of the Church resided in Moscow, reaffirmed its administrative autonomy, and resolved to defend itself against ‘ ‘ harmful and unfounded claims from outside” (exh. R [7] [1927]). The exhibit last referred to spoke of the harm and sorrow inflicted upon the American Church by the Synod residing at Sremski- *1040 Karlovtsy and asked that the Synod cease what was regarded as work of ‘ ‘ incalculable detriment and injury ’ ’ and of an ‘ ‘ inimical ’ ’ nature. Their complaints were spelled out again in February 2, 1927 in an Act of the Synod (of the American diocese, exh. C [8]) in which they recommended the removal of Bishop Apolinarius from his post in San Francisco. This caused an eruption of moves and countermoves.
Platon removed and interdicted Apolinarius, Bishop of San Francisco (who had come out of the Synod where his loyalties lay) and consecrated Archimandrite Alexis, bishop in that cathedral (exh. M [6]-1). The Synod declared the action uncanonical, null and void; it claimed to remove Platon as head of the North American Diocese and interdicted him (exh. M [6]-l).[8] Platon’s conduct of his office and his desire for autocephaly were referred to critically by the Synod in reaching its determination. The Synod’s interdiction of the Metropolia spanned the years from 1927 to 1935. Conditions between the contending organizations continued so strained that Patriarch Varnava of Sorbía, a friend of the Russian Church, invited the bishops of the Middle Eastern, Far Eastern, North American and Western European Districts to Sremski-Karlovtsy to confer, in the hope that peace and unity could be brought to the Orthodox Church outside Russia. The invitation was accepted and beginning in 1935 a series of conferences was held in Sremski-Karlovtsy presided over by Patriarch Varnava.
These deliberations formulated Temporary Statutes (exh. PP) designed to establish the Synod of Bishops as the supreme authority for the Russian Orthodox Greek Catholic Church outside Russia by all who would accept them, including the Metropolia. The query, therefore, (“the key question”) is, did the Metropolia accept them.
At Sremski, Bishop Evlogius, Metropolitan of Western Europe, proposed that four autonomous areas remain without a higher authority even of limited power, while Bishop Anastasius preferred Metropolitan districts with a Synod of Bishops as supreme. Eventually the Temporary Statutes were drafted, more or less as suggested by Bishop Anastasius. Dissatisfied with the product, Bishop Evlogius noted that the Statutes did *1041 not clearly express the idea of local power exercised through the Metropolitan; and Bishop Theophilus (from the Metropolia) claimed that the Temporary Statutes did not grant the Metropolitan Districts internal autonomy (exh. MM-1). Bishop Anastasius, fearing that these objections would split the group asunder, suggested that the problem would be solved in time as passions cooled (exh. MM-1). This served only to delay the break. The Synod of Bishops held that the signing of the Temporay Statutes and the minutes of the meetings by all participants was a recognition of the Synod of Bishops as the Highest Church Administration. Contrary to this position, at the third meeting in December, 1935, Bishop Evlogius stated that the Statutes must be considered in his district by the Diocesan Assembly and the Assembly of the Bishops of his former Metropolitan District separately, then by a meeting of both. Bishop Theophilus indicated that in North America he would “call a joint meeting of bishops of both jurisdictions in order to carry out the terms of the Statutes.” (Exh. MM-1.)
When, at Detroit in 1924 the Metropolia declared its autonomy, it adopted “Seven Points on Self-Government” (exh. N). These provided (Point 2) that the Metropolitan was “ to head the administration of the Church and to rule it first with the cooperation of the existing Council of Bishops and Diocesan Council — .” It is clear that the Metropolitan’s authority was limited and that the laity, as well as clergy, were to be consulted (Point 6).
The different views were expressed at a meeting in Sremski in November, 1935, when it was noted that “ one can only speak of acceptability or non-acceptability of the Statutes as far as a given district is concerned” (exh. NN-1). In the face of the expressed reservations by Evlogius and Theophilus, it was the Synod’s view that the Statutes were to be accepted as written or not at all. Thereafter, Bishop Evlogius withdrew his agreement to a portion of the Statutes because it would ‘ ‘ constrain ’ ’ his freedom of communication with his parishioners (exh. OO-l). Evlogius desired to limit discussion and pleaded for agreement since he had yielded already on several matters to achieve peace. However, he insisted that his right to communicate freely with his parishioners could not be surrendered. Failing consent of the group he declared his intention to sign the Statute with reservation (exhs. OO-l, LL-1). Two of the bishops would have closed their eyes to this disagreement. Theophilus joined Evlogius in dissent. Evlogius abandoned the group. Thus, the Synod which was to contain Middle East, Far East, North America, and Western Europe according to the Temporary Statutes *1042 (exh. PP) had dwindled to three members (exh. WW). The Synod accepted Evlogins ’ action as an accomplished fact, and proceeded to establish competing parishes in his area of influence (exh. FFFF). The purpose to unite the groups was never realized. It seems that the District Bishops had enjoyed independence from 1920 to 1935 which they were not prepared to surrender. Nevertheless, the Synod of Bishops clung to their wish to be the Supreme Church Authority.
Submission to the Synod of Bishops as the Supreme Church Authority was in the nature of an agreement which would require acceptance of the Temporary Statutes. The organizational structure of the Temporary Statutes called for a Synod of Bishops composed of four districts. Once Bishop Evlogius withdrew from further meetings in Sremski-Karlovtsy, the composition contemplated for the Synod of Bishops became impossible. Four separate groups were to compose a united church under the Temporary Statutes and their separate undertakings supplied a consideration to each of the others. When one departed, perhaps the others were free to go. At the trial, the witness, Father John Schmemann, stated that two of the original districts no longer exist. Since the original purpose of these Sremski meetings could no longer be achieved, no binding relationship was created because the structure of the organization changed.
The Temporary Statute provided structurally that: the Russian Orthodox Church abroad was an inseparable part of the Russian Orthodox Church, the Assembly of Bishops would be the highest legislative, judicial and administrative body of the Church abroad; and the Holy Synod of Bishops would be the Executive branch (exh. PP; B [8]-l). Since the Temporary Statutes omitted the two chief requirements of the Metropolia, autonomy of a Metropolitan unit and the inclusion of laity in any decision-making body (similar to the all-American Sobor (exh. DDD-1) ), the Metropolia would not accept them.[9]
The Temporary Statutes were submitted to the Metropolia’s Council of Bishops in Pittsburgh in 1936 and “were accepted and placed into effect in the life of the North American Metropolitan District, leaving inviolable its already existing autonomy ” (exh. UU-1). This reference is only one of many, which in sum indicate that the insistence by the Metropolia on autonomy and the participation of laity in the affairs of the Church, was hostile to the scheme of the Temporary Statutes. The *1043 American Bishops decided (1936) “to accept the regulations of the above-mentioned Temporary Statutes for guidance of our ecclesiastical life and to carry out its execution in life, on the basis and with the aid of the Council Spirit, or honorable Clergy and of our God loving people, taking in consideration those local conditions, autonomous rights, established laws of the country directing how to guide the church life according to the rule of the Saint Apostle Paul: ‘ Despite all temptations, steer a good course’.” (exhs. XX-1, Q, A [8]-l, Y-l). Again and again the Metropolia by its spokesmen politely express their goodwill but are rigid in their refusal to accept the new rule unconditionally. It appears most clearly from exhibit Y-l that ‘ ‘ changes and additions ’ ’ would be proposed. Of course, the Metropolia by the equivocal nature of its actions made the resolution of the issues here difficult and gave substance to the Synod’s claims upon the Lady of Kazan and its parishioners.
Finally, the All-American Sobor in 1937 voted: “ to accept the ‘ Temporary Statutes ’ with those changes which were made therein in 1936 in Sremski-Karlovtzi, as declared by His Eminence Makary, and with adjustment of these ‘ Statutes ’ in conformity with the local conditions of the [or our] District.” (exh. W W ; see ZZ-1).
Obviously the All-American Sobor accepted the Temporary Statutes as did the Bishops of North America, subject always to the District’s autonomy. His Eminence, the Metropolitan, Chairman of the All-American Sobor, commented that only three districts remained since the Western European District’s rejection of the Statutes. He remarked that the Temporary Statutes ‘ ‘ carry a moral significance more than an administrative one — they show our union, our unity, but they do not bind us — ” (exh. W W). Bishop Anastasius recognized the limitation placed on the Temporary Statutes when he complained that the Temporary Statutes worked out earlier were accepted by the Metropolia only as a moral document, not an administrative one, and accommodations had yet to be worked out (exh. X [7]-2). The Bishops of the Metropolia notified their clergy and laity that the All-American Sobor accepted the Temporary Statutes, but: “ At the same time, the District remains self-governing (autonomous) in its local affairs, with its own rules, but as concerns general church matters sends its Bishop-representative to the Sobor and to the Synod of the Russian Orthodox Church Abroad ’ ’ until the re-establishment of normal relations (exhs. VV, AAA-1).
We find that the Synod’s claim of the Metropolia’s subservience cannot be reconciled with the repeated assertions of auton *1044 omy by the Metropolia which are described in the course of this decision. It may be observed again that some of the meaning of the original documents, most of them in Russian, was lost in translation, but what emerges is that while the Metropolia repeatedly expressed the desire to be united they adhered to their wish for autonomy. The Temporary Statutes were never actually accepted for always there were conditions imposed (see for example YY-1, November 1937) which precluded a binding agreement (PBA v. City of New York, supra, p. 417). In fact, four bishops associated with the Synod of Bishops who attended the All-American Sober, objected that the Metropolia’s Statutes conflicted with the Temporary Statutes (exh. EEE-1; see also GrGrGr-1). The Synod of Bishops recognized that the Metropolia had not yielded when, in discussing the actions of the All-American Sobor they said: ‘ ‘ But, on one hand, we see that the Provisional Statute is adopted by them, but on the other hand we see contradictions to it.” (exh. PEE).
Concerning the Metropolia’s Statutes the Synod of Bishops commented: ‘ ‘ Metropolitan Theophilus in requesting to leave the protest of four bishops without consequences, writes, that the new Statute is not in contradiction with the Provisional Statute. We can not agree with this.” (exh. PEE).[10] Similar circumstances could be related but it would be a needless recital to support the finding that a merger was not effected.
Evidence that the Metropolia gave small sums to the Synod of Bishops for a few years and applied to it for a number of awards and religious articles (exhs. QQQ, OOOO, RRR, TTT, UUU, VW, CC-1, DD-1, Z-l, T-5), cannot be taken to indicate more than that the Metropolia was attempting to co-operate with the Synod of Bishops (cf. MMM-1). Both sides testified to the effect of these awards and the elevation of various religious people. (The term “ elevation ” describes the mentioning of an individual, e.g., another member of the clergy during a church service.) At this distance and with the information submitted to us we conclude that both sought an elusive union.
The Metropolia’s rejection of the Temporary Statutes was in conciliatory tones and accomplished a temporary measure of peace during which the rivalry between the groups was sub *1045 merged. When the Synod was confronted with the resolutions adopted by the Metropolia at the All-American Sobor in 1946 in which the Metropolia affirmatively declared its independence of any administrative direction by the Synod, the latter recognized the Metropolia’s attitude and took no overt action to enforce its claimed authority over the Metropolia.
In 1942, a group of residents in Sea Cliff, New York, wishing to create a parish in the Russian Orthodox Greek Catholic Church, sought assistance from the Metropolia and later petitioned it for leave to organize a parish. In the petition (exh. 2 & 2A) addressed to Metropolitan Theophilus the signatories committed themselves 11 to live according to the Normal Statute of the Russian Orthodox Greek Catholic Church of America.” The application was approved July 15, 1942 (exh. 3-A). The church was named Our Lady of Kazan and Father Moussin-Poushkin was appointed priest of the new parish by Metropolitan Theophilus (exhs. 3-A, R-l). Metropolitan Theophilus responded to the parishioners’ request to bless their church. The new parish of Our Lady of Kazan paid dues to the Metropolia, sent representatives to the Metropolia’s meetings, sent copies of the minutes of the parish meetings to the Metropolia for approval. It had no association with the Synod of Bishops. The parish filed a certificate of incorporation in New York on December 3, 1942 indicating that it was within the Russian Orthodox Greek Catholic Church and adopted the name The Russian Church of Our Lady of Kazan. We find that the oral and documentary evidence supports the conclusion that the choice by the parish of the Metropolia as against the Synod was deliberate.
In January 1948, the Metropolitan certified the parish by-laws (exh. 7). In December of that year, when Father Moussin-Poushkin left the Parish, the Metropolitan appointed Father Alexis Yonov Rector of Our Lady of Kazan (exh. S-l). Father Yonov had been a priest affiliated with the Synod; while he was still in Austria seeking a parish he was recommended to the congregation of Our Lady of Kazan. He applied to his superior for a release from the Synod and sought admission to this country and into the Metropolia (exh. J [5]). These facts are additional evidence of the Parish’s affiliation with the Metropolia (Matter of Presbytery of Albany, 35 A D 2d 252, affd. 28 N Y 2d 772).
There is nothing to indicate that at the time of its organization the Parish of Our Lady of Kazan intended to come within the influence of the Synod of Bishops. The Synod did not come here until years later. In fact, counsel for the defen *1046 clants conceded and Father Grabbe testified that the Parish joined the Metropolia. Defendants contend, however, that the Metropolia remained within the hierarchy of the Synod of Bishops because it adopted the Temporary Statutes, and therefore the Parish of Our Lady of Kazan was also within the Synod of Bishops. Since, as previously determined, the Metropolia had given only a tentative and conditional acceptance of the Temporary Statutes, the Parish was in the Metropolia and never came within the Synod of Bishops.
The years 1938 to 1946 were relatively quiet. The Metropolia sent a representative to Sremski to join the meetings of the Synod. When the Metropolia appointed John Zlobin Bishop of Alaska, it sought and received confirmation of the appointment from the Synod (exhs. U-5; X-5; Y-5). The Metropolia asked the Synod to grant awards to Bishops Tikhon and Vitaly (exhs. C-5; D [5] -1), who had been members of the Synod prior to the Temporary Statutes (exh. 15-A).11 Apparently, in the spirit of maintaining peaceful relations, the Metropolia and Synod consulted and co-operated with each other. However, these practices never affected the Metropolia’s resolve to remain self-governing. The Synod did not challenge the Metropolia’s determination. Instead it set up competing parishes as it had done in Western Europe when Evlogius announced that he had abandoned his efforts to reach an accommodation with the Synod under the proposed statutes. It would seem that the Synod was satisfied to continue a tentative and ambiguous relationship expecting in time to achieve an accord with the Metropolia. The Metropolia’s actions raise doubts but these are not proof of the merger.
In 1946, the All-American Sobor requested the Moscow Patriarchate to recognize their autonomy and sought a reconciliation with the Moscow Church. However, because he opposed this action and wanted autocephaly instead, Metropolitan Theophilus was interdicted by the Moscow Patriarchate (exh. F-5). The Metropolia forwarded suggestions to Moscow which would have given it autocephaly, according to a Moscow representative (exh. F-5), while the Moscow Patriarchate wished to effect a union with the Metropolia. At the All-American Sobor in Cleveland, in 1946, the Metropolia again acknowledged the Moscow Patriarch as its spiritual but not administrative head, on condition that the American church retain complete autonomy. Because the spiritual relationship with the Patriarch would be *1047 incompatible with, the relationship to the Russian Orthodox Synod abroad, the Metropolia stated that it was terminating any administrative subordination to the Synod abroad while retaining spiritual and brotherly relations with All-Russian Orthodox churches abroad (exh. C-l). We regard this as a statement made in clarification of the Metropolia’s position that it had never intended to surrender autonomy and that any ambiguity in the relationship of the two would be laid to rest. At the Sobor a delegate from Our Lady of Kazan voiced the Parish’s refusal to recognize the Moscow Patriarch or accept subordination to a church which might be controlled by an atheistic government (exh. 0-2).[12] Also at that Sobor five bishops formerly affiliated with the Synod (the same four who protested the proceedings taken in the All-American Sobor in 1936 [exh. GrGrGr-1] plus a recent arrival to America), objected to the action taken and seceded from the Metropolia (exh. 15-A).[13] Informed of the proceedings at the Sobor and of the secession of the bishops, the Synod decided to approve the action taken by the five Soborny Bishops, to renew its activities in North America and Canada and to establish areas of responsibility and assign bishops to them (exh. 15-A).
The Synod’s acceptance of the Metropolia’s decision is revealed in the Synod Order No. 221 issued in March of 1947 (exh. 15A). That instrument recognized the “new division within the Russian Orthodox Church in North America ” and the reason why the five “ Russian (soborny) bishops ” seceded from the American Metropolia, ‘[1] for them the only possible way to remain faithful to the Synod of Bishops of the Russian Orthodox Church ’ ’. The order also noted the fundamental differences between the Synod and the Metropolia and the Synod’s refusal to accept the participation of laity in church decisions. The Synod described lay participation as a transfer of authority from the ‘ ‘ soborno-canonical ecclesiastical basis to the level of introducing in the Church a purely secular administrative system providing that the votes of the laymen have an equal importance with those of bishops ” (exh. 15-A, p. 2). The order went on to acknowledge that the Synod would now have to strengthen its position on this continent. The Synod realized at last that the Metropolia would never agree with the Synod’s views which precluded lay participation in Church matters.
*1048 By 1952 the Synod had left Europe and settled in New York. It filed its certificate of incorporation on August 18 of that year (exh. 29).
In 1955, another All-American Sobor again declared the Metropolia’s autonomy and reaffirmed the supreme legislative, administrative and judicial authority in the All-American Sobor (exh. 32).
In 1963 the by-laws of Our Lady of Kazan were amended and stated that the Parish was part of the Russian Orthodox Gfreek Catholic Church of America headed by Metropolitan Leonty of the Metropolia and that its religious life was organized in accordance with the statutes of that Church adopted at the 1955 All-American Sobor (exh. 14-A).
It reflects on the parties’ attitudes toward each other that the Metropolia was not included as a diocese nor Our Lady of Kazan listed as a parish in the official Synod yearbooks for 1949 through 1970. That was changed in 1971 when Our Lady of Kazan was included as a Parish within the Synod. Parishes in Grlen Cove and Sea Cliff are both listed in the Synod’s yearbooks. All the Metropolia’s yearbooks from 1949 through 1970 name Our Lady of Kazan as a Parish within its influence.
Late in 1969, new discussions between the Patriarch, Alexis, concerning autocephaly for the Metropolia, led to the present litigation. One group of parishioners supported the request for autocephaly; the other opposed it fearing that any negotiations with the Moscow Patriarch would lead to Communist control of the Church. When a meeting of the Parish was called in the regular course of the corporate business for the purpose of electing officers for the new year, the discord among the parishioners became more patent. Wishing to let tempers cool, the Metropolitan adjourned the annual parish meeting from February 1, 1970 to May 1970 (exh. C[7]-l). With the prospect of autocephaly imminent, the parishioners opposed to it were stirred into action and formed an ‘ ‘ Ad Hoc Committee ’ ’. This committee pressed to hold the annual meeting as scheduled on February 1, 1970 and thereafter mailed announcements to all parishioners that (1) there was to be either a departure or secession of the Parish from the Metropolia; (2) to be accomplished by amending the by-laws to eliminate any reference to the Metropolia and to seek affiliation with the Synod; and (3) Father Yonov was urged to follow so that the Parish would not lose its pastor (exh. 19-B; see, also, exh. 23). For lack of a quorum, the meeting of the “ Ad Hoc ” group held on February 1, 1970 was adjourned to February 22, 1970 and notices were mailed advising parishioners of the adjourned date. *1049 On February 5,1970,149 parishioners addressed a letter to their Rector, the Right Reverend Alexis Yonov, clearly indicating their disapproval of the Metropolia’s negotiations then under way with Moscow and expressing a ‘ ‘ desire to secede from the jurisdiction of the Metropolia and to join the jurisdiction of the Russian Orthodox Church Abroad — .” Eventually Father Yonov followed these parishioners (exhs. K-l, 25, 27), much to the displeasure of his Metropolitan Ireney (exh. GG-1). Each of the groups held a meeting on February 22, 1970. The defendants (the “ Ad Hoc ” group) voted to amend the by-laws “ to delete the reference to affiliation with the Russian Orthodox Greek Catholic Church of North America” and to substitute for it affiliation ‘ ‘ with the Synod of Bishops of the Russian Orthodox Church Outside Russia ” (exh. G-7). At the Ad Hoc meeting a priest from the Synod of Bishops welcomed the Parish into the fold of the Synod and Father Yonov was accepted as a Synod priest (exh, K-7). On the Wednesday following (February 25,1970) his group published an advertisment announcing that the Parish had left the Metropolia and joined the Synod (exh. V-l).
Father Yonov had been appointed the parish priest for Our Lady of Kazan by the Metropolia (exh. S-l); he was associated with the Metropolia and editor of its official publication; he resigned from the Metropolia and joined the Synod of Bishops as a result of the parish controversy. This too suggests the control the Metropolia had over the parish and its priest.[14]
The Ad Hoc Committee and its followers then took possession of the parish property, excluded the other parishioners from its use in furtherance of their purpose to transfer Our Lady of Kazan to the Synod of Bishops. At that stage the plaintiffs commenced this action seeking injunctive and other relief.
A discussion of the controlling legal principles in this case should begin with a reference to the decision of the United States Supreme Court in Kedroff v. St. Nicholas Cathedral (344 U. S. 94). There, as here, the dispute centered on the “ right to the use and occupancy of a church ” (id., p. 95). In Kedroff the Court decided that a Cathedral purchased prior to the Russian Revolution, title to which was in the Metropolia, nevertheless remained in the control of the Moscow Patriarchate since *1050 that organization never relinquished its authority over the North American diocese. The Court stated: ‘ ‘ The record before us shows no schism over faith or doctrine between the Russian Church in America and the Russian Orthodox Church. It shows administrative control of the North American Diocese by the Supreme Church Authority of the Russian Orthodox Church, including the appointment of the ruling hierarch in North America from the foundation of the diocese until the Russian Revolution. We find nothing that indicates a relinquishment of this power by the Russian Orthodox Church.” (p. 120). What controls, therefore, is not title or secular questions, but a determination as to which is the faith in whose service the Church was dedicated (Watson v. Jones, 80 U. S. 679).
Trustees of a church are fiduciaries and they will be compelled to discharge their trust so that “ those who are the real beneficiaries ’ ’ will be permitted ‘ ‘ to enjoy the uses, to protect which that trust was created ” (Watson v. Jones, supra, p. 721).
Plaintiffs complain that defendants’ theory that the Metropolia was merged into the Synod is a new idea never urged prior to this action. Nevertheless, if true, it would provide a basis for the conclusion that Our Lady of Kazan became part of the hierarchy of the Synod.
When St. Nicholas was purchased, before the Revolution, it was under the control of the Russian Orthodox Church; therefore nothing the Metropolia did subsequent to the Revolution, e.g. the 1924 declaration of autonomy, or its repetition thereafter, could remove the Cathedral from the control of the Moscow Patriarchate. In fact, no one disputed that in 1918 when the Cathedral was dedicated to the North American Diocese, the Archbishop of the Diocese was subject to the Patriarchate of Moscow (St. Nicholas Cathedral v. Kreshik, 7 N Y 2d 191, 205, revd. 363 U. S. 190). The Supreme Court’s decision in Kedroff does not lead to the conclusion that the Church of Our Lady of Kazan belongs in the hierarchy of the Moscow Patriarchate because Our Lady of Kazan was created in 1942 after the schism between the Moscow Patriarchate and its former diocese. Our Lady of Kazan was incorporated within the Metropolia which, as we have seen, declared its independence of the Moscow Church in 1924.
This Court does not interpret the Supreme Court decision in Kedroff to mean that every parish incorporated in the United States under the Metropolia or the Synod professing to be a church of the Russian Orthodox faith is ultimately subject to the hierarchal control of the Moscow Patriarchate. To hold otherwise would be to deny to the particular parishioners their *1051 express desire not to subject themselves to the Moscow Patriarchate.[15]
The defendants Dunkel, et al., in claiming that the Metropolia was merged into the Russian Orthodox Church Abroad, are partisans of the Synod’s point of view. Had Moscow retained its authority over the Metropolia, then the Metropolia as a diocese within a hierarchal church, would not have been free to merge its properties with those of any other church group. Individuals might move freely, otherwise the free exercise of religion would be inhibited. In this connection the statement of the Supreme Court in Kedroff could be applied: From those circumstances it seems clear that the Russian Orthodox Church was, until the Russian Revolution, an hierarchical church with unquestioned paramount jurisdiction in the governing body in Russia over the American Metropolitanate (p. 105). They follow this by stating that the Moscow Church did not relinquish its authority or recognize the autonomy of the American Church. However, the Moscow Patriarchate is not a party to the action, and the Lady of Kazan was created after the Metropolia declared its autonomy as against the Moscow Church (the schism) and now by virtue of the agreement (exh. 0) has become an auto-cephalic church.[16] Judge Desmond (later Chief Judge) in his strong dissent in St. Nicholas Cathedral v. Kedroff (302 N. Y. 1, 38) observed that the Metropolia was a schismatic group. It is not for the courts to make a determination on canonicity *1052 because that question lies in an area of decision reserved for the church and which the court generally may not invade (Kedroff v. St. Nicholas Cathedral, 344 U. S. 94, 116, Note 23).
The decision of a church court on an ecclesiastical matter is conclusive upon the civil courts, and where the church judicatory had jurisdiction to determine the matter, it is not for this court to ask whether they followed the customs and laws of the church nor whether the issue was correctly determined. In such an instance the decision of the church court is final and binding upon the parties and the civil courts may not review such determinations (Connitt v. Reformed Protestant Dutch Church of New Prospect, 54 N. Y. 551, 562).
However, we are not precluded from treating of property questions so that what is placed in trust may continue in that trust (Watson v. Jones, 80 U. S. 679, supra).
In Pennsylvania a dispute arose in a Russian Orthodox Church concerning the use and control of a parish incorporated into that religion. The parish in the case of St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat (259 A. 2d 862) was founded in 1909 and incorporated in 1915. Its certificate of incorporation indicated that it was a part of the Russian Orthodox Church and a member of the Diocese of North America. The Court said “ Here as in Kedrdff, supra, we are confronted with a dispute over church property originally dedicated to the Russian Orthodox Church.” (p. 869). The Court further held that the parish church should remain subject to the control of the Moscow Patriarch because “ The Charter quite clearly placed St. Michael’s within the hierarchical structure of the Russian Orthodox Church.” That Court’s decision parallels that of the United ¡States Supreme Court in Kedroff in that the cathedral and parish were each incorporated into the Russian Orthodox faith before the post-revolutionary schisms. These courts determined that the property must remain under the control of the Moscow Patriarch which had not relinquished them and that no fewer than all the parishioners could remove them from the trust into which they were given.
However, we encounter other circumstances, because Our Lady of Kazan was incorporated in the Russian Orthodox faith after the schism when the North American Diocese declared its autonomy in 1924 (exh. 5), and there were then three authorities in the United States, each of which claimed to be the true Russian Orthodox Church, vying with the others for control over parishes. (See St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat, supra, p. 865; Russian Orthodox Greek Catholic All Saints Church v. Kedrovsky [Conn. *1053 Sup. Ct. of Errors], 156 A. 688, 690; Ryszko v. Kaimakan, supra, p. 653). This situation often may have bewildered the faithful.
In determining which hierarchal structure the Parish of Our Lady of Kazan joined, the intentions of the incorporators must be considered (Pennsylvania State Spiritualist Assn. v. First Church of Spiritual Research & Healing, 244 A. 2d 31, 33 [Pa. 1968]), and we have already stated our findings which led to the conclusion that they selected the Metropolia against either of the other.
The majority opinion by the New York Court of Appeals in the first St. Nicholas Cathedral case stated that Patriarch Sergius recognized that the North American Diocese had achieved practical authoritative autonomy and that it was now necessary for the Russian Church to organize a new diocese in America (St. Nicholas Cathedral v. Kedroff, 302 N. Y. 1, 16, revd. 344 U. S. 94). Judge Desmond described the Metropolia as: acting under the control of, and in the interest of, a dissident or schismatic group of Russian Orthodox Catholic individuals and parishes, which group, formed at Detroit in 1924, refuses to recognize the authority and primacy of the Patriarch of Moscow (p. 36). (See also St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat, supra, p. 865.) Therefore, the Moscow Patriarch did not have ultimate control over Our Lady of Kazan.
Religious organizations may be divided into two groups— congregational and hierarchical churches. It has been said: ‘ ‘ A congregational church is an independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government. [Case cited.] ‘ Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head. ’ [Case cited.] ” (Knight v. Presbytery of Western N. Y., 26 A D 2d 19, 21, affd. 18 N Y 2d 868). (See, also, Matter of Presbytery of Albany, 35 A D 2d 252, 254, affd. 28 N Y 2d 772.) Our Lady of Kazan, by deliberate choice, was incorporated into the Metropolia; and as other courts have found, we find that the Metropolia is a hierarchically structured church of the Orthodox communion (St. John’s Greek Catholic Hungarian Russian Orthodox Church of Rahway v. Fedak, 233 A. 2d 663, 668 [New Jersey 1967]; St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat, supra, p. 865).
The Metropolia since 1924 has been accepted as the leading Russian Orthodox Church in America but the Moscow Patriar *1054 chate had characterized the Metropolia as schismatic and interdicted its clergy and people (Russian Orthodox Greek Catholic Church v. Burdikoff [Ohio] 189 N.E. 2d 451, 452, cert. den. 374 U. S. 808). In determining controversies within religious organizations, the United States Supreme Court established a rule which must be followed by our courts: All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. (Watson v. Jones, 80 U. S. 679, 729, supra.)
In the case of a schism, the courts will adjudge the property to the members, however few in numbers they may be, who adhere to the form of church government, or acknowledge the church connection, for which the property was acquired. (50 N. Y. Jur, Religious Societies, § 135.) (See, also, Independent Methodist Episcopal Church v. Davis, 74 A. 2d 203, 209 [Conn. 1950].) The majority of the members of a parish in a hierarchically structured church cannot abandon the tenets and doctrine of the denomination and retain the right to use the church property, since as secessionists they forfeit all right to the property. If a single member adheres to the original faith and doctrine of the church, then any members of the church association fewer than the whole may not divert it therefrom (St. Nicholas Ukrainian v. St. Nichols Ruthenian, 157 N. Y. S. 2d 586, 612, affd. 4 A D 2d 741). (See, also, Russian Orthodox Greek Catholic Church v. Burdikoff, supra, p. 454; 45 Am. Jur., Religious Societies, §§ 61, 68.) The corporate owners of religious property hold that property in trust for the entire religious body to which it was dedicated (St. Nicholas Cathedral v. Kedroff, supra, p. 20) and the assets are not the property of an individual or group but belong to the “ spiritual body under whose influence and guidance the individuals act, teach and inculcate the word of God, as trustees ” (Beth Jacob of Boro Park v. Morgan Appliances, 196 Misc. 677, 678). (To same effect, Watson v. Jones, supra, p. 734). Although courts express a reluctance to become embroiled in these disputes, this does not mean they will not protect and determine property rights (Mount Zion Baptist Church v. Second Baptist Church, 432 P. 2d 328 [Nev., 1967]). Section 5 of the Religious Corporations Law provides in part that: ‘ ‘ The trustees of every religious corporation shall have the custody and control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance *1055 with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject, and with the provisions of law relating thereto, for the support and maintenance of the corporation * * * and they shall not use such property or revenues for any other purpose or divert the same from such uses.” The objective of the statute is to provide an orderly method of administering the property and temporalities of religious groups and to protect them from exploitation by those who would divert them from the beneficiaries of the trust (St. Nicholas Cathedral v. Kedroff, 302 N. Y. 1, 29). The Court of Appeals went on to say that in enacting section 5 of the Eeligious Corporations Law, the Legislature provided that: the trustees of religious corporations, irrespective of the wishes of the majority of the local congregation, must administer the temporalities in accordance with the discipline, rules and usages of the ecclesiastical body, if any, to which the corporation was subject. (See, also, Crest Chimney Co. v. A hi Ezer Congr., 62 Misc 2d 1040, 1047.) Since Our Lady of Kazan entered into the hierarchy of the Metropolia, the Ad Hoc Committee’s attempt to amend the parish by-laws to remove the parish from the control of the Metropolia was fruitless so long as a member of the parish professed allegiance to the Metropolia. The rebellion or secession could not terminate the relationship of Our Lady of Kazan to the Metropolia (Trustees of Presbytery v. Westminster Church, 222 N. Y. 305, 315; Crawford v. Freeman, 189 Misc. 882, 884).
During this extended trial the Court gave full opportunity to all parties to explore any area within this controversy that would assist the Court in determining this dispute; at times the Court heard testimony and received evidence on canon law and ecclesiastical questions. As counsel for defendants frequently cautioned us, we have no authority to, nor have we decided this controversy upon canon law since to do so would violate the First Amendment to the United States Constitution by inhibiting the free exercise of religion (Presbyterian Church v. Hull Church, 393 U. S. 440, 449). We may, however, determine disputes over church property without trespassing into areas of controversy over religious doctrine. Thus, there is no violation of the First Amendment when civil courts decide church property disputes without interfering with or attempting to resolve underlying controversies over religious doctrine and practice, and without implicating secular interests in matters of purely ecclesiastical concern. (Matter of Presbytery of Albany, 63 Misc 2d 791, 793, 794, affd. 35 A D 2d 252, affd. 28 N Y 2d 772.) Therefore this Court may not determine that *1056 the Metropolia’s application for autocephaly is inconsistent with that body’s tradition, practices and beliefs (Presbyterian Church v. Hull Church, supra, p. 452).
The defendants lean heavily upon the decision by the Superior Court of the State of California in the Russian Orthodox Church of Transfiguration of Our Lord v. Lisen (Superior Court, Los Angeles County, No. 536524, decided Nov. 29, 1948 but not reported). The Court there adjudicated a dispute between opposing groups of parishioners, one alleging its loyalty to the Synod of Bishops and the other to the Metropolia. The litigation arose out of the displeasure of the first group with the decisions reached at the 1946 Cleveland Sobor to make overtures to the Moscow Patriarchate seeking autocephaly. The Judge in Lisen found that those who formed the parish in 1930 intended to practice their faith under the guidance of the Synod of Bishops of the Church Abroad. In 1934 when that parish adopted its by-laws, they expressly indicated their wish to be subject to the canonical rule of the Synod. Their priest was appointed by a bishop subject to the Synod. The Court also found that in 1935 the parish, pursuant to the Temporary Statutes, had come under the immediate jurisdiction of Metropolitan Theophilus and that he in turn was subject to the Supreme Church Administration of the Church Abroad (Synod of Bishops).
In examining the question whether the Temporary Statutes were ever adopted by the Metropolia, the Court concluded that they were signed by Metropolitan Theophilus and approved by the All-American Sobor. The Metropolia’s contention that they retained their autonomy was not supported by the Sobor’s resolution, according to the Court.
This Court disagrees with the decision by the California Court concerning the Metropolia’s adoption of the Temporary Statutes. The Metropolia did not subordinate itself to the Synod but insisted on retaining its autonomy. There are a number of findings in the California decision with which this Court disagrees. That Court in commenting that from 1927 to 1935 two separate organizations existed in the United States — the Metropolia and the Synod of Bishops — failed to take cognizance of the parishes of the Moscow Patriarchate. The Court also noted that under the Temporary Statutes the parties had composed their differences. In our view and in the light of findings previously made this is inaccurate; and in fact the California Court failed to recognize that the four groups that were to compose the Supreme Church Administration fell apart. Although the California Court observed that the Synod believed in the Church having for its supreme authority a group of *1057 bishops while the Metropolia in a supreme church authority called the Sobor, composed of bishops, clergy and laity, he failed to recognize that this basic conflict rendered the two incompatible. Having recognized that distinction, the Court should have applied that knowledge to the actions at the conferences on the Temporary Statutes and the conduct of the Metropolia thereafter. Had he done so, he would have concluded that the Metropolia never manifested its intention to adopt the Statutes nor to surrender its autonomy.
The Court also reached conclusions concerning the canonical existence of the Synod of Bishops. For instance, that Court stated that the ultimate right to rule the church was placed in the hands of the bishops; that the Metropolia offered no canons to support their withdrawal from the Supreme Church Authority (Synod of Bishops); that there was no canon cited to support the existence of the All-American Sobor consisting of bishops, clergy and laity. Thus that Court was determining canonical questions which the defendants here have time and again cautioned us to adjure.
Finally, the California decision was rendered before the landmark opinions of the Kedroff, Kreshik, and the Presbyterian Church v. Hull Church cases, which prohibit the judicial determination of church property disputes by resolving controversies over religious doctrine, i.e. canonical questions.
The California Court found that the Church Abroad (Synod of Bishops) was and still is the Supreme Church Administration and that once it was created it was necessary for all bishops to recognize and subject themselves to its authority; those who did not were labeled schismatic. This is a conclusion of a canonical nature and violates the rule of Presbyterian Church v. Hull Church, supra, in that it restricts the free exercise of religion; every parish that joined the Russian Orthodox religion would automatically be subject to the Synod of Bishops though three jurisdictions claimed supreme authority for that religion in the United States.
Though we disagree with many of the findings made in arriving at the decision in the California case, we would have reached the same conclusion, simply because the parish in question was incorporated into the Synod of Bishops and it never left that jurisdiction. The Judge in the Superior Court in California said: ‘ ‘ From the time of its founding Transfiguration Parish has been a part of and has maintained its allegiance to The Church Abroad. It was founded by a group, composed in part of emigres from Russia, who acknowledged the authority [sic] of The Church Abroad. At the request of this group the Ruling *1058 Bishop of The Church Abroad in North America assigned to it its first priest. It only acknowledged the immediate supervision of the defendant Metropolitan Theophilus, because he became a part of The Church Abroad by virtue of the Provisional Statute of 1935. Its by-laws specifically provided that it was subject to The Church Abroad and its diocesan bishop, and under the guidance of a priest appointed by such bishop. In 1936 it received the normal parish statutes distributed under the direction of the defendants Metropolitan Theophilus and thereafter conducted its affairs by reference to its by-laws and these statutes. While these statutes made no reference to The Church Abroad, the membership continued to consider that that portion of its by-laws which did refer to The Church Abroad was still binding. When informed of the enactment of the Cleveland Sobor’s resolution of 1946, its membership, by almost a two-to-one majority, refused to be bound thereby and reaffirmed their allegiance to The Church Abroad and elected a Church Committee, the majority of whom were of the same determination. ’ ’
We would differ with only one of these findings and all but that one were sufficient to support that Court’s conclusion that the Parish with which he was concerned had accepted the hierarchy of The Church Abroad. The single finding which we cannot accept is that the Metropolitan Theophilus had become a part of The Church Abroad by virtue of the Provisional Statute of 1935.
The California Court found support for its decision in a case decided in Connecticut in 1931 (Russian Orthodox Greek Catholic All Saints Church v. Kedrovsky, 156 A. 688). The Connecticut Court decided the dispute in favor of the group showing allegiance to the Synod of Bishops and stated: “ On the other hand, the Karlovtzi Synod is attempting to carry out as best it may, in view of the disruption of the church, a central organization representing the traditional polity of the church, and it is the only body which apparently is attempting to do this.” (p. 691). Thus the Court determined that the Synod of Bishops was the true representative of the Russian Orthodox faith. That decision is contrary to the rulings of the United States Supreme Court prohibiting judicial courts from reviewing ecclesiastical questions. The Connecticut case too was decided prior to the Supreme Court decisions which guide and control us. Moreover, the parishioners in the Connecticut case all agreed to amend their by-laws to reflect their desire to come under the jurisdiction of the Synod. This alone was sufficient for the Court to conclude that the parish was within the Synod rather *1059 than the Metropolia; it was unnecessary to pass upon canonical questions to arrive at that conclusion.
Some of the same issues raised here were presented earlier to the Court of a sister State. It is appropriate to note what that Court had to say about these issues. We are not particularly interested in whether Moscow or Sremski-Karlovtzi governs. Whether the Sobor, sanctioned by Locum Tenens Sergius, was not the lawful supreme successor and unlawfully elected Kedrovsky; or Platon’s appointment was unauthorized or his credentials fictitious; or whether the Council of the Bishops Abroad was an unlawful assembly and their control of the Church Abroad and their declaration of self-government usurpations, and their removal of Platon and the appointment of Apollinary, the repudiation of Sergius, and the recognition of Peter as Locum Tenens were unwarranted assumptions of power — are all questions unessential to the decision of the issues here involved. Which of the three divines is de jure involves the title to the office of Metropolitan, and must be litigated by the principals or decided by the legally constituted church authority, to the conclusion of the civil courts. For present purposes it is enough that the proofs show that Archbishop Platon and his Diocesan Council continue to function over his flock -, and that he holds under color of right, if not de jure, at least de facto, the office of Metropolitan of the diocesan organization of churches of which St. Nicholas is an integral part, and, having appointed, had the power to remove, Father Kaimakan.. A member priest of his group, with a handful of parishioners, cannot, upon defection and discharge, be heard to deny his jurisdiction, and set up the denial in justification of a diversion of the organization’s property to a new allegiance. Their course was to quit. It was Father Kaimakan’s privilege, and that of his followers, to change masters, but not to purloin the ship; to renounce the authority to which he had committed himself, but not to thwart it. (Ryszko v. Kaimakan, 153 A. 651, 653 [N. J., 1931].) That decision, rendered long before the present controversy, concerns some of the same parties that appeared before this Court and the conclusion there arrived at may be applied here.
We are aware that in spite of the assurances in the Soviet constitution and statutes (exhs. Q-6, B-6, T-6 and U-6) the right of religious worship is severely restricted in that nation. However, recalling Judge Desmond’s caution in Kreshik, Soviet policy regarding freedom of religion is not a question which may affect our determination of the issues presented in this case.
*1060 Accordingly, in the light of our findings and applying the controlling principles of law, the Court declares that the Parish of Our Lady of Kazan is a parish within the jurisdiction of the Metropolia and that plaintiffs’ request for an injunction to restrain the defendants (Ad Hoc Committee) from interfering with the plaintiffs’ use of this property in accordance with the religious beliefs and doctrines of the Metropolia must be granted. The alleged amendments to the by-laws of Our Lady of Kazan by the Ad Hoc Committee on February 22, 1970, which would transfer the Parish from the Metropolia to the Synod of Bishops are invalid. The question of title does not free the local church from the obligation to administer the property in accordance with ecclesiastical rules (Matter of Presbytery of Albany, supra).
We would summarize our findings as follows: The Russian Orthodox Greek Catholic Church of America, the Metropolia, originally a mission of the Mother Church in Moscow, later achieved status as a diocese. It declared its autonomy and administrative independence from the Mother Church in 1924, though it acknowledged its progenitor as its spiritual head. In the mid-1980s the Metropolia participated with other Metropolitan Districts in an effort to unite the Church under a proposed set of Temporary Statutes but union was never consummated because of the differing philosophies of church governance. The Metropolia did not merge with nor become a part of a hierarchal church structure other than itself. The Church of Our Lady of Kazan was incorporated into the Metropolia by individuals who deliberately chose that hierarchal structure.
Thus we respectfully answer ‘ ‘ the key question ’ ’ directed to us by the Appellate Division that it was the Metropolia and not the Synod of Bishops of the Russian Church in exile which “ was the supreme ecclesiastical body by which this parish was to be governed when it was incorporated ’ ’ (Russian Church of Our Lady of Kazan v. Dunkel, supra).
The defense of laches urged by the Metropolia is not reached because of the other persuasive issues in this case.
The request of the plaintiff Parish for money damages is denied. There was no proof that the Parish suffered damage by virtue of the ouster from the church property or because of injury to the structure and its contents, either of which might have provided a basis for compensatory damages.
Plaintiffs’ claim to be reimbursed in damages for their attorneys’ fees and disbursements is also denied except to the extent of taxable costs and disbursements.
*1061 In an action for an injunction, a court in granting such relief and as incidental thereto, may award exemplary as well as compensatory damages (I.H.P. Corp. v. 210 Cent. Park South Corp., 12 N Y 2d 329 ; 14 N. Y. Jur., Damages, § 176).
The expense of carrying on a lawsuit beyond the taxable costs and disbursements allowed may not be recovered either as general or special damages and counsel fees are not an exception (13 N. Y. Jur., Damages, § 143) unless there is an express statutory provision or the parties have agreed otherwise (25 C. J. S., Damages § 50). That the opposing party acted wrongfully in subjecting the successful party to a lawsuit would not alter the general rule unless the action be one to recover damages for conduct of a willful or malicious nature, as for example, malicious prosecution and false arrest when “ recovery of counsel fees and expenses is permitted ” (Gorman v. Kings Mercantile Co., 36 Misc 2d 38, 39).
Expenses of litigation including attorneys’ fees may be considered not as compensation but as punishment for wrongful and malicious acts (25 C. J. S. Damages, § 50-d). Where the conduct of a party is of such a nature that similar behavior should be discouraged, the court can award punitive or exemplary damages. However, the court or jury must be satisfied that such conduct was wanton, willful or malicious (14 N. Y. Jur,, Damages, § 176 et seq.; see Gordon v. Nationwide Mut. Ins. Co., 62 Misc 2d 689). Besearch of New York law concerning punitive damages has failed to reveal a clear policy on whether attorneys’ fees should be included as an element of punitive damages in all cases. A review of this subject in 30 ALR 3d 1443 indicates a division of authority.
However, this Court is not confronted with that issue since plaintiffs’ proof has failed to demonstrate that defendants’ conduct was wanton, willful or reckless. In fact, defendants were acting pursuant to the advice of counsel and believed their actions were proper. Certainly that conduct was not “ tantamount to criminality ” justifying punitive damages (Gordon v. Nationwide Mut. Ins. Co., supra, p. 695).
The Court wishes to acknowledge to counsel his debt for their careful and exhaustive presentation of the issues and for the helpful trial memoranda and all post-trial briefs so that the Court might have all of the facts and authorities from which to draw his conclusions. The dedication of counsel is noteworthy.
The foregoing is the decision of this court pursuant to CPLB 4213.
Settle judgment on notice.

. The individual plaintiffs in the first action, Pouschine, Jr., et al., are sometimes referred to as “ loyalists ” because they wish to remain within the hierarehal structure of the Metropolia while the defendants in the first action, plaintiffs in the second action, Dunkel, et al., in contrast have been described as “secessionists” (also “Ad Hoe Committee”) because of their desire to become affiliated with the Synod of Bishops, which body will be more fully described in the course of this decision. To refer to plaintiffs and defendants in these terms here, however, would be in a manner to prejudge the issues,

. In this decision the “ Synod of Bishops ” designates that organization of bishops which met outside Russia and later at Sremski-Karlovtsy in the middle 1930’s and prepared the Temporary Statutes.

. Disputes between the parties regarding translations of documents offered in evidence created difficulties. For illustration, Ukase No. 362 referred to what should be done if communication with “the Highest Church Administration” were cut off. The instrument authorized a diocesan bishop or bishops to organize “ a highest instance of Church Authority ”. Obviously there could not be two highest church administrations. What must have been intended was that there would be a “ superior ” authority for the group or groups created outside Moscow until contact with the Patriarchate was re-established. Plaintiffs’ exhibits are numbered 1 through 40. Exhibits of the defendants Dunkel, et al., and of the Metropolia were designated by letters of the alphabet and as one alphabet was exhausted subsequent exhibits were marked AA, etc. through F-8. A number following a lettered exhibit indicates a translation and where there is more than one such number, it indicates a difference of opinion as to translation.

. References to the history, often with some variation which would not alter the outcome of this decision, are contained in exhibit GGG-1 and in 16 Encyclopaedia Brittanica [1953], The Eastern Orthodox Churches in America, p. 941A; St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat, 259 A. 2d 862, cert, denied 400 U. S. 823; Russian Orthodox Greek Catholic All Saints Church v. Kedrovsky, 156 A. 688; Russian Orthodox Greek Catholic St. Peter and St. Paul’s Church of Lorain v. Burdikoff, 189 N.E. 2d 451, cert, denied 374 TJ. S. 808; Ryszko v. Kaimakan, 153 A. 651; St. John’s Greek Catholic Hungarian Russian Orthodox Church of Rahway v. Fedak, 233 A. 2d 663.

. Father Grabbe, a principal witness for the defendants, had endured many hardships. He was devoted to the Synod. His learning and recollection of the history of the Church were most impressive and helpful to the Court’s understanding of events.

. At the initiation of efforts at Sremski-Karlovtsy to unite the Church outside Russia, the right of the Synod to organize under Ukase No. 362 was disputed (exh. LL-1).

. When the Synod moved here in 1950 and filed its certificate under then §3 of the Religious Corporations Law of the State of New York, one of the stated purposes was to provide for the administration of dioceses, etc. and parishes, etc. of the churches located in countries outside the Soviet Union and its satellites “ but including dioceses, missions, monasteries and churches which recognize the corporation as the supreme ecclesiastical authority over them.” This suggests that the Synod did not intend to include parishes which refused to recognize its administrative direction (exh. 29). The authority which it sought to assume is revealed in an Ukase issued in September of 1922 (exh. JJ-1).

. The Synod’s position with respect to Ukase No. 362 (exh. M [6] -1) is not always consistent with other claims it makes. Having learned of the Ukase the Synod found in it authority for its own existence, though later it bowed to the directions of Ukases 347, 348 and 349, dissolved, and formed a newer Synod. However, in March of 1927, in repudiating the act of Platon in removing Apolinarius and appointing Alexis to his place it refers (exh. M [6]-1, p. 3) to Ukase No. 362 and to Sergius as the Locum Tenens of the office of Patriarch in the Moscow Church.

. Apparently the descendants of those who had brought the Church to these shores wished to participate even in ecclesiastical decisions which would affect their lives.

. The differences are outlined in a letter written by Anastasias to Metropolitan Theophilus in July of 1938 (exh. JJJ). The letter carries an interesting comment by the recipient (see also exh. KKK-1). They find expression again in exhibit 000-1. This exhibit, which was signed by Father George Grabbe as Chancellor for the Synod is a record of the minutes of a meeting of the Synod of Bishops held in December of 1937. Father Grabbe himself recorded the difficulties which attended the adjustment of the views of the Synod and of the Metropolia.

. Doubt arises whether these awards were requested from the Synod because these bishops were considered part of that organization or because of the Temporary Statutes.

. The approach to autoeephaly appears again in late 1969 and is the spark that ignites the present controversy.

. In many instances the source for the finding is contained in several exhibits although frequently we have identified only one.

. An extract from the Metropolia’s publication “ Messenger ” of 1945 (exh. W-l) contains an interesting note expressing doubt on the canonieity of the Moscow Patriarch and leaving the question for future determination. It also compared procedures in the old Russian Church with the democratic procedure adopted in America for lay participation.

. In Kedroff v. St. Nicholas Cathedral, (344 U. S. 94, 105) the Court spoke of the conditions required by the Moscow Patriarchate in 1945 “ for reunion of the American Orthodox Church with the Russian.” The Court went on to say that the “ Cleveland Sobor of 1946 refused the preferred arrangement ” and resolved to terminate “ ‘ any administrative recognition of the Synod of the Russian Orthodox Church Abroad-.’ ” The two matters had no relation to each other. The American Church rejected the Moscow offer before the Cleveland Sobor. The resolution which was adopted at the Sobor did not relate to the Moscow offer but was a restatement by the Metropolia of its independence of the Synod (ef. St. Michael and Archangel Russian Orthodox Greek Catholic Church, etc. v. Uhniat, et al., 259 A. 2d 862 [Pennsylvania (1969)], cert. den. 400 U. S. 823).

. It does not affect this decision but it is of interest to know that on May 31 of this year, the New York Times reported in a release from Moscow that the Russian Orthodox Church had renewed its pledge of loyalty to the Soviet regime at a meeting called to elect a new Patriarch. It reported too that the late Patriarch Alexis “ had ruled the church, in close collaboration with the Soviet leaders, for 25 years.” On June 3rd, in a Moscow dispatch dated the previous day, the Times reported the election of Patriarch Pimen. That dispatch stated “that the choice was completely acceptable to and presumably approved by Soviet authorities, who carefully monitor the religious life in this country.” The report continued that the church “ has been supported by Soviet authorities to an extent denied other religious bpdies.”