St. Michael and Archangel Russian Orthodox
Greek Catholic Church *v.* Uhniat
et al., Appellants.

Argued November 12, 1968. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused January 12, 1970.

John S. Manos, with him Philip Adler, of the New York Bar, for appellants.

Ivan Michaelson Czap, for appellees.

OPINION BY MR. JUSTICE EAGEN, November 11, 1969:

In this action in equity, the basic issue is whether St. Michael and Archangel Russian Orthodox Greek Catholic Church of Philadelphia (St. Michael's) is subject to the patriarchal jurisdiction of the Moscow-based general Russian Orthodox Church, officially known as "The Russian Orthodox Greek Catholic Church" (Russian Orthodox Church), or is it within the jurisdiction of "The Russian Orthodox Church of America" commonly known as the "Metropolia." Upon the determination of the proper jurisdiction hinges certain property rights.

The chancellor in the court below, after extended hearings, entered an adjudication and a decree nisi ruling that as of that date St. Michael's was within and under the ecclesiastical jurisdiction of the Patri-

arch of the Russian Orthodox Church, but that it could, by a majority vote of its parishioners, join the "Metropolia." After considering exceptions to the chancellor's adjudication and decree, the court en banc entered a final decree ruling in favor of "Metropolia" jurisdiction. Two interrelated appeals are now before us.[1]

Although the background of the Russian Orthodox Church, both in the Soviet Union and in the United States, is not at issue here, it appears to us to be quite necessary to relate that ecclesiastical history in order to put this controversy in its proper context. In the rendition of that history, we are aided by the thorough and scholarly discussion of the chancellor below.

The Russian Orthodox Church is an autocephalous member of a family of churches known as the Eastern Orthodox Churches, and whose official title is the "Holy Orthodox Catholic Apostolic Eastern Church." Orthodoxy was first introduced into Russia in the ninth and tenth centuries through the missionary activities of the Patriarch of Constantinople. Christianity became firmly established in Russia by the end of the tenth century, and continued to flourish there until the Bolshevik Revolution in 1917.

In the middle of the fifteenth century, Constantinople was conquered by the Turks, and the power of the Patriarch of Constantinople quickly waned, to the delight of the Russians. In 1453 the Russians, for the first time, elected their own Metropolitan, and by the end of the sixteenth century, the Patriarchate of Russia had been established.

---

[1] One appeal (No. 351) was filed from the lower court's decree ordering that a parishioners' meeting be held to vote on the jurisdictional affiliation of the Church (see infra). The second appeal (No. 254) was filed from the final decree entered below. Our disposition of the basic issue disposes of both appeals.

The independent Patriarchate was not long to enjoy harmonious relations with the Russian Czars; the latter increasingly exerted their authority and influence over the Church until Peter the Great discontinued the Patriarchate in 1721, and established in its place the "Holy Synod", a body composed of representative bishops, religious orders and priests, and of course, of the Czar himself who became known within the Synod as the "Supreme Judge of the Spiritual College." The Church continued in this subjugated role, a mere branch of the government, until the Revolution of 1917. Acting with the permission of the Provisional Government, the first Church Sobor (convention) in centuries was held in 1917-1918; the outcome was the reestablishment of the Patriarchate, and the selection of Tikhon as Patriarch.

The future of the Russian Church was doubtful in a political system which regarded atheism as the state religion. Immediately after coming to power, the Bolshevik Government restricted, if not totally abrogated, the rights of the Church. Tikhon encouraged church members to resist property confiscation by the government, but in 1922, he was arrested and incarcerated.

With Tikhon out of the way, a small group of church clergymen, unfaithful to their promises to Tikhon to bestow complete administrative powers to a designated bishop during his absence, held a Sobor, abandoned the Patriarchate and created the "Provisional Supreme Administration" as the ruling body in the Russian Church. The new organization came to be called the "Living Church" and its influence spread rapidly because its founders kept in the good graces of the Soviet Government.

In 1923, the "Living Church" held its second Sobor and defrocked Tikhon, who died in 1925.

Tikhon's successors were also imprisoned because of their unwillingness to negotiate with the Soviet Govern-

ment. In 1927, however, Sergius, the suffragan Patriarch, reached an Accord with the government, promising on his part, to oppose the counterrevolutionary activities asserted against the Soviet Government; the government reciprocated and gave recognition to the Patriarchal Church. Thereafter the "Living Church," bereft of its favored position with the government, which it enjoyed from 1922 to 1927, declined in influence.

The Patriarchal Church lived through many shaky days from 1927 until 1932. Thereafter, the Soviet Government exerted less control over the Church's internal operations, and when the Church supported the Russian war effort in World War II, the government became more tolerant of it. Stalin restored the office of Patriarch in 1943, and Sergius was chosen Patriarch. Following Sergius' death in 1945, Alexy was elected Patriarch and continues in that office now. The Soviet Government is generally tolerant of the Church today and, apart from its mass anti-religious propaganda, does not interfere with the Church's activities.

The Russian Orthodox Church is a missionary church. Late in the eighteenth century, a mission was established in Alaska. With the purchase of Alaska by the United States in 1867, the mission was elevated to a diocese and the See was eventually transferred from Alaska to San Francisco. In 1900, Russian Orthodoxy began to spread and grow dramatically due to the immigrations of the Greek, Russian, Slavic and Syrian peoples. The See of the North American Diocese was moved to New York City in 1905, and the famous St. Nicholas Cathedral, itself the object of frequent litigation, was erected.

St. Michael and Archangel Russian Orthodox Greek Catholic Church of Philadelphia was founded in 1909 and incorporated in 1915. The Corporate Charter quite

positively reveals that St. Michael's was founded as a constituent part of the Russian Orthodox Church. Article II, Section 2 of the Charter provides as follows: "This Church acknowledges itself to be a member and to belong to the Russian Orthodox Greek Catholic Church in the North America Diocese and as such, it accedes to, recognizes, and accepts the Constitution, Canons, Doctrines, Discipline and Worship of the Russian Orthodox Greek Catholic Church in the Diocese of North America and acknowledges their authority accordingly."

Until the Russian Revolution of 1917, Orthodoxy in the United States existed without schism or dissension; the ecclesiastical right and authority of the Holy Synod was unquestioned. The political situation in Russia was, however, bound to affect the Church wherever it was established.

Although Moscow fell to the Bolsheviks in 1917, the "White Russians" in the south continued resistance. When in 1921 it had become obvious that their efforts were doomed to failure, many of the ecclesiastics left Russia and, at the invitation of the Serbian Patriarch, held a conference at Karlovitzy, Yugoslavia. The result was the formation of the "Russian Churches Outside of Russia" (the Karlovitz Synod group) whose supreme authority was a "Synod of Bishops Outside Russia." This group continued its active resistance to the Bolshevik take-over, and fought for the restoration of the Czarist government. The Karlovitz Synod group has been declared to be uncanonical by Patriarchs Sergius and Alexy.

In 1923, the "Living Church" sent John Kedrovsky, a political bishop, to the North American Diocese. Kedrovsky, in March 1924, began his endeavors to gain control of St. Nicholas Cathedral in New York City, claiming that he was the legitimate Archbishop of the

North American Diocese. By the time Kedrovsky instituted his suit to gain St. Nicholas Cathedral, the Patriarchal Archbishop Platon had already been dismissed from his office by Patriarch Tikhon because of his support of the Russian counterrevolutionaries.[2]

In April 1924, an all-American Sobor was held in Detroit. The representatives to that Sobor suspected strongly that Kedrovsky was a pawn of the Soviet Government; they also feared that a new Patriarchal Archbishop might be a tool of the Soviet State. Determined to resist Kedrovsky's efforts to wrest control of church property from them, the delegates formed the American Diocese of the Russian Orthodox Church ("Metropolia") and elected Platon as their Archbishop.[3] The "Metropolia" thus established is hierarchical in nature, structured with the governing Metropolitan, a Council of Bishops, and a Council of the Laity. The "Metropolia" has always asserted that its origin is legitimate and that it has a valid claim on Orthodoxy. Authority for its existence is said to rest upon a Patriarchal Ukaz (decision) of November 20, 1920, which temporarily gave authority to churches outside Russia to govern themselves until the political situation in Russia calmed.

The lower court inferred, quite correctly we think, that the "Metropolia" was not regarded as a schismatic and competing hierarchy of the Patriarchate until 1933, when the Patriarch sent Benjamin to the North Ameri-

---

[2] In 1917, Evdokim, the Archbishop of the North American Diocese, returned to Russia to attend the Sobor which reinstituted the Patriarchate. He never returned to the United States. Suffragan Archbishops temporarily administered the North American Diocese until September 1923 when Platon was appointed Archbishop. Platon had previously served as Archbishop of the North American Diocese from 1907 to 1914.

[3] St. Michael's was not represented at this Sobor.

can Diocese to replace Platon as Archbishop. This is so because the Patriarchal Decree of 1924 dismissing Platon for his opposition to the Soviet Government was effective only when Platon's successor announced the dismissal to him, which, of course, did not occur until 1933. Benjamin stayed in the United States as Patriarchal Exarch, but the "Metropolia" continued to exist and to grow.

Thus, three rival hierarchies (the Patriarchal Exarchate, the "Metropolia", and the Karlovitz Synod Group), each claiming to be the legitimate representative of Orthodoxy in the United States, exist and vie against each other today.

The history of St. Michael's Church is best approached by following the ecclesiastical path traveled by Bishop Adam who was, without question, the most important figure in the life of St. Michael's. The origin of most of St. Michael's parishioners was Carpatho-Russia, which prior to World War I was a part of the Austro-Hungarian Empire, and after World War I became the territory of Poland and Czechoslovakia. Many immigrants came from Carpatho-Russia to the United States in the early 1900's, and in 1916, the Holy Synod and Russian Emperor granted the Carpatho-Russians permission to establish an independent diocese. The Holy Synod appointed a special Carpatho-Russian Suffragan Bishop.

In 1923, Adam was consecrated Bishop of the Carpatho-Russian Diocese. St. Michael's joined Adam's diocese, and remained under his leadership until his retirement in 1954. In 1935, Bishop Adam reached an agreement with the "Metropolia" and joined that organization, still retaining, however, a measure of independence for his parishes. In 1939, Adam withdrew from the "Metropolia", preferring instead the total independence to which he had formerly been accustomed.

From 1939 to 1944, Adam governed his parishes without hierarchical allegiance.[4]

In 1944, Adam joined the Patriarchate, and eventually became the Exarchal "Locum Tenens" in the United States.

The causal background of the instant controversy probably has its roots in the occurrences at St. Michael's since 1939. When Adam disaffiliated with "Metropolia" in 1939, St. Michael's had as its parish priest Reverend George Cucura, who came to St. Michael's in 1936 as a priest faithful to Bishop Adam. Reverend Cucura continued his allegiance to the "Metropolia" after 1939. The parishioners desired to dismiss Reverend Cucura from 1939 until 1949, but were unable to obtain another priest. The parishioners turned to the Patriarchate to find a priest, but that organization demanded that St. Michael's first amend its Charter, so as to align itself unmistakably with the Patriarchate. That condition was rejected. Finally, the "Metropolia" assigned another priest to St. Michael's and instructed Reverend Cucura to serve another parish. Reverend Cucura refused, withdrew from "Metropolia" and joined the Patriarchate. Thereafter, he was influential in bringing Patriarchal priests to St. Michael's, and St. Michael's had Patriarchal priests until late 1955 when the Patriarchate was unable to furnish a priest. At that time, the "Metropolia" sent Reverend Alexander Fedoronko to St. Michael's; he has remained there since then.[5]

In 1962, Reverend Fedoronko announced to the parish that St. Michael's was a Metropolitan Church.

---

[4] In 1939, Adam was disciplined by the Patriarchate which, for the first time, questioned the validity of his consecration as a Bishop.

[5] The Patriarch consented to Reverend Fedoronko's assignment at St. Michael's.

That statement was severely criticized by a substantial faction of St. Michael's which denied "Metropolia's" jurisdiction, and claimed Patriarchal jurisdiction for St. Michael's. When Reverend Fedoronko postponed a parish meeting set for the election of officers on February 3, 1963, the Patriarchal faction nevertheless held an election, and affirmed St. Michael's relationship with the Patriarchate, giving Reverend Fedoronko thirty days notice to leave the parish. The "Metropolia" ecclesiastical courts issued decrees disciplining the leaders of the Patriarchal group; Reverend Fedoronko and certain parish members then brought suit against the Patriarchal faction, seeking an injunction against their interference with the alleged right of "Metropolia" to control the parish. The Patriarchal faction counterclaimed, seeking for itself, an injunction restraining Metropolitan influence over St. Michael's.

The Patriarchal faction argued that St. Michael's was founded as a church united jurisdictionally with the Russian Orthodox Church under the Holy Synod; that the substitution of the Patriarch for the Holy Synod in 1917 as the supreme ruling authority in the Church was canonical and resulted merely in an organizational change within the Church, leaving Church doctrine and ritual entirely intact; that the Patriarchate has never relinquished or abandoned its control or influence over St. Michael's and that the Lay Control of Church Property Act, Act of June 20, 1935, P. L. 353, 10 P.S. §81, prevented the court from awarding the use of St. Michael's to the "Metropolia".

The "Metropolia" faction argued that the "Metropolia" has, by a kind of evolution, become the North American Diocese of the Russian Orthodox Church to which St. Michael's was dedicated in 1915, and hence, that it, consistent with the Charter, has the right to control St. Michael's.

The chancellor found that St. Michael's was founded in 1909 and incorporated in 1915 as a Church within the North American Diocese of the Russian Orthodox Church, and accordingly, under the authority of the Holy Synod; he found further that the substitution of the Patriarch for the Holy Synod as the supreme ruling authority within the Church was merely an organizational change, not at all affecting the basic nature of the Russian Church. The chancellor concluded, however, that the Charter could not resolve the controversy because at the time when St. Michael's founders dedicated the Church to the Russian Orthodox Church, it was the only hierarchical organization within the Russian Orthodox Church represented in America; that the founders of St. Michael's could not foresee the political changes which occurred in Russia in 1917, nor could they foresee the effect which the political changes had on the Russian Orthodox Church. In line with that reasoning, the chancellor undertook to discover what were the reactions of St. Michael's parishioners to the changes wrought by the Russian Revolution, and how those reactions affected St. Michael's jurisdictionally. The first reaction, said the chancellor, was a Church bylaw passed in 1925, permitting St. Michael's to select their ecclesiastical jurisdiction from among the several which then existed. According to the chancellor, the bylaw was consistent with the Charter, again because the Charter was formulated when there was but one Russian Orthodox hierarchy in the United States. The chancellor then found that, acting pursuant to the 1925 bylaw, St. Michael's united with Bishop Adam's Carpatho-Russian Diocese from 1925 until 1935; from 1935 until 1939 with the "Metropolia"; from 1939 until 1944, with Bishop Adam; and from 1945 on, with the Patriarchate. The chancellor found that from the time when Reverend

Fedoronko came to St. Michael's onward, practically all of St. Michael's jurisdictional ties have been with the "Metropolia". He concluded, however, that this de facto affiliation with the "Metropolia" and secession from the Patriarchate was in violation of the Lay Control of Church Property Act, supra, and constituted an illegal diversion of church property. According to the chancellor, a valid and legal union with "Metropolia" could have been accomplished by a majority vote of St. Michael's parishioners, but since the last majority jurisdictional vote was in favor of the Patriarchate, the de facto affiliation with the "Metropolia" was illegal. The chancellor concluded that St. Michael's could in the future finally bind itself to the "Metropolia" by a majority vote of its parishioners, and an amendment to its Charter.

Before the court en banc ruled on the exceptions to the decree nisi filed by both sides, the appellees, the "Metropolia" group, petitioned the court to conduct the annual election of officers. The court issued an order calling for a court-supervised election which was held on May 7, 1967. At that meeting over the strenuous objections of the appellants, the Patriarchal group, the majority of the parishioners voted to be under the "Metropolia" and to amend the Charter so as to make the affiliation permanent.

The court en banc accepted most of the chancellor's adjudication. It too found that St. Michael's affiliation with the "Metropolia" was consistent with the Charter of 1915, holding that the "Metropolia" was the legitimate successor of the Patriarchate, and the true North American Diocese since 1917. In effect, the court en banc held that the Patriarchate had abandoned the North American Diocese after the Russian Revolution, releasing its claim upon it from 1917 until 1933 when it denounced the "Metropolia" and sent Ben-

jamin to the United States as the Patriarchal Exarch. The court en banc, unlike the chancellor, held that St. Michael's became validly a part of the "Metropolia" in 1955 when it accepted Reverend Fedoronko as its parish rector, with the approval of the Patriarch. Thus, the court en banc held that the only jurisdictional effect the court-supervised election of May 7, 1967, was to affirm the already existing relation between St. Michael's and the "Metropolia", and to give authority for a Charter amendment which would recognize that relation and make it permanent. The appellants, the Patriarchal group, then appealed. For reasons that follow, we reverse.

The landmark decision in church-property disputes is *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871). In that case, a local Presbyterian Church became divided over the General Assembly's position on slavery; the minority faction of the congregation opposed the General Assembly's position, seized control of the church property, and seceded from the General Assembly. The Kentucky courts examined the position of the General Assembly, and concluded that it had illegally imposed upon civil matters. The litigation was brought to the federal courts on diversity jurisdiction, and the Supreme Court of the United States affirmed the Circuit Court's reversal of the Kentucky court, holding that the local church was a constituent part of the hierarchical church organization, equipped with ecclesiastical judicatories; that in such a situation, the doctrine of separation of church and state required that the decrees of the highest church tribunal be binding on the civil courts. The rule thus formulated was a radical departure from the English law as enunciated in *Craigdallie v. Aikman*, 1 Dow. 1, 3 Eng. Rep. 601 (H.L. 1813), and *Attorney-General Ex rel. Mander v. Pearson*, 3 Mer. 353, 36 Eng. Rep. 135 (Ch. 1817). The so-

lution under English law was reached by ascertaining which church faction adhered to the *doctrine* espoused by the church founders, regardless of the decision of the highest church judicatories on the subject. This method of solution involved, of course, court introspection into what were the original doctrines held by the founders, and the ascertainment of which church faction was loyal to those doctrines. An obvious byproduct of the English rule was the civil disregard of the decisions of church courts, and consequently, the discouragement of hierarchical religious systems. *Watson,* supra, decided on principles of federal common law, refused to assure doctrinal continuity at the risk of curtailing the growth and establishment of religious systems and ideas, and at the risk of preventing the meaningful functioning of church judicatories.

The basic principles of *Watson,* supra, find constitutional emphasis in the decisions of the Supreme Court of the United States in *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S. Ct. 1037 (1960) ; *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S. Ct. 143 (1952) ; and most recently in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S. Ct. 601 (1969).

In *Presbyterian Church v. Hull,* supra, the United States Supreme Court foreclosed any possibility that the principles of *Watson,* supra, do not apply to the states. The nature of the dispute in *Presbyterian Church v. Hull,* supra, closely resembled the problem in *Watson,* supra. The hierarchical organization in both cases was the Presbyterian Church in the United States. In *Presbyterian Church v. Hull,* a local congregation sought to withdraw from the general church organization and, of course, to take the local church property with it. The reason asserted for the seces-

sion was that the General Assembly had, in certain matters, departed from the Church's traditional doctrine and teaching. Under Georgia law, the doctrinal-continuity approach of the English courts is followed, and the general church organization can hold a local church in trust only as long as it continues in the practice of traditional religious tenets. The Georgia courts submitted to a jury the question of whether the General Assembly had departed from the traditional doctrine, and the jury found that it had, thereby breaking the trust, and freeing the local church from the hierarchical structure. The Supreme Court granted certiorari and reversed the Georgia Supreme Court, finding the "departure from doctrine" element of the implied-trust theory unconstitutional.

The *Presbyterian Church* decision thus fosters denominational continuity and doctrinal evolution by making the decision of the Church tribunal the last word in the settlement of a church dispute arising in a hierarchical church organization.

*Kedroff,* supra, involved a dispute over the right to the use of St. Nicholas Cathedral in New York City. The parties in interest were the "Metropolia" and the Patriarchal Exarchate of the Russian Orthodox Church. The New York Court of Appeals awarded the use of the Cathedral to the American "Metropolia" on the ground that a New York statute transferred the administrative control of the Russian Orthodox Churches in North America from the supreme church authority in Moscow to the authorities selected by a convention of the North American churches. The Supreme Court of the United States reversed, holding the pertinent legislation unconstitutional; the Court indicated that any legislation which determines in a hierarchical church ecclesiastical administration or the appointment of clergy or transfers church property from

one group to another impinges upon the free exercise of religion. In *Kreshik,* supra, the Supreme Court, relying on *Kedroff,* again reversed the New York Court of Appeals which on the basis of New York common law, awarded the Cathedral to the American "Metropolia", contending that the supreme church authority in Moscow was dominated by the secular authorities in the Soviet Union.

*Kedroff,* supra, and *Kreshik,* supra, just as *Watson,* supra, and *Presbyterian Church,* supra, give substance to the idea of denominational continuity, and thus the freedom of religious organizations to expand and evolve without fear of government censure. Here as in *Kedroff,* supra, we are confronted with a dispute over church property originally dedicated to the Russian Orthodox Church. In *Kedroff,* the transfer of church property from that hierarchical organization could not be accomplished by legislative fiat. Here, St. Michael's property cannot be transferred simply because a majority of its parishioners so desire. If that were permitted, then no real protection would be afforded to hierarchical religious systems. It seems to us that a logical reading of the relevant decisions of the United States Supreme Court produces the conclusion that the constitutional protection of hierarchical organizations precludes not only legislative and judicial action which would destroy church government, but also action by church members themselves which effects a transfer of church property from the control of one hierarchy into the hands of a competing hierarchy. St. Michael's, whether a member of the Russian Orthodox Church of America or of the Patriarchal Exarchate (Russian Orthodox Church) is a constituent part of a church hierarchy. Given such a structure, we find untenable the chancellor's conclusion that the 1925 bylaw allowing St. Michael's to choose by majority vote its hierarchi-

cal allegiance, is consistent with its corporate Charter. The Charter secured St. Michael's relationship within a hierarchical organization; the bylaw, in effect, sought to make St. Michael's congregational in form.

Apart from the decisional law discussed above, the Lay Control of Church Property Act, supra, requires that the property of St. Michael's Church remain subject to the control of the Patriarchate. Construing that act in *Canovaro v. Brothers of the Order of Hermits of St. Augustine,* 326 Pa. 76, 191 A. 140 (1937), we held that a local church cannot sever its relation with the ecclesiastical body under whose direction it was organized and with which it has continually been affiliated and retain ownership of church property without the consent of such ecclesiastical body. See also, *Kraftician v. Greek Catholic Congregation,* 366 Pa. 431, 77 A. 2d 875 (1951); and *Gabster v. Mesaros,* 422 Pa. 116, 220 A. 2d 639 (1966).

We thus conclude that the lower court erred in going beyond the 1915 Charter to resolve the instant dispute. The Charter quite clearly placed St. Michael's within the hierarchical structure of the Russian Orthodox Church under the Holy Synod. The succession from the Holy Synod to the Patriarchate is recognized as canonical by the Russian Orthodox Church and accordingly must be regarded as such by the civil courts under *Watson,* supra, and *Presbyterian Church,* supra. The lower court has shown no authority for its conclusion that a dedication of a local congregation to a hierarchical general church organization is binding on the local church only until some other hierarchy, administratively and judicially independent of the first but embracing the same religious faith and precepts, comes along. That being so, the decrees of the lower court are reversed and the record is remanded for action consistent with this opinion.

It is so ordered. Each party to bear own costs.

Mr. Justice ROBERTS dissents for the reasons set forth in *St. John Chrysostom Greek Catholic Church v. Elko,* 436 Pa. 243.