The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 6, 2020

## 2020COA20

No. 18CA1149, *Korean New Life Methodist Church v. Korean Methodist Church of the Americas, Jin Hi Cha* — Religious Organizations — Property; Constitutional Law — First Amendment — Freedom of Religion — Doctrine of Judicial Abstention — Neutral Principles of Law Analysis

As a matter of first impression, a division of the court of appeals considers whether a local church submitted to the authority of the national denomination and whether the polity approach or neutral principles of law should be used to answer this question. Relying on *Bishop & Dioceses of Colorado v. Mote*, 716 P.2d 85 (Colo. 1986), the division holds that neutral principles of law should be applied to answer the submission question. Because the district court properly applied neutral principles to the hearing facts to conclude there was no submission, the division

affirms the judgment.  The division further denies the request for attorney fees.

COLORADO COURT OF APPEALS          **2020COA20**

Court of Appeals No. 18CA1149
El Paso County District Court No. 18CV31065
Honorable David Prince, Judge

Korean New Life Methodist Church, a Colorado non-profit corporation,

Plaintiff-Appellee,

v.

Korean Methodist Church of the Americas, a California non-profit corporation, and Jin Hi Cha,

Defendants-Appellants.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE FREYRE
Taubman and Pawar, JJ., concur

Announced February 6, 2020

Mulliken Weiner Berg & Jolivet P.C., Murray I. Weiner, Hilary A. Roland, Colorado Springs, Colorado; Weeks & Luchetta, LLP, Jeffrey L. Weeks, Colorado Springs, Colorado, for Plaintiff-Appellee

Nussbaum Speir PLLC, Ian Speir, Colorado Springs, Colorado, for Defendants-Appellants

¶ 1    The First and Fourteenth Amendments to the United States Constitution preclude civil courts from resolving religious disputes involving religious law and decisions of ecclesiastical tribunals, including disputes involving church governance (polity approach). *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09 (1976). But when a dispute involves the ownership and control of church property, our supreme court both permits and requires civil courts to apply neutral principles of law in resolving them (neutral principles approach). *See Bishop & Diocese of Colo. v. Mote*, 716 P.2d 85, 96 (Colo. 1986). This approach includes inquiring into whether the local church has submitted to the authority of a national denomination. *See id.* at 100.

¶ 2    No Colorado court, however, has decided the questions presented here — whether the local church actually surrendered its control and submitted to the authority of the national denomination, and whether the polity or neutral principles approach should be used to answer this question. This dispute between the local church, plaintiff, Korean New Life Methodist Church, and the national denomination, defendants, Korean Methodist Church of the Americas and Pastor Jin Hi Cha, arose

1

from the denomination's attempt to retitle church property from the local church's to the denomination's name, contrary to the local church's articles of incorporation, bylaws, and board resolutions.

¶ 3    We hold, consistent with *Mote*, that the submission to authority question is one arising from the local church's organization and that neutral principles of general corporate law must be applied to resolve it. *Id.* at 99. Therefore, we discern no legal error in the district court's decision to apply neutral principles. As well, we discern no clear error in the district court's application of neutral principles to the evidence or in its finding that the local church never ceded control or submitted to the denomination's authority. Accordingly, we affirm the judgment.

## I.    Background

### A.    Factual

¶ 4    In 1996, the local church began as a prayer group in the home of founder Mr. Jong Kim. In February 1997, Mr. Kim incorporated the prayer group as a nonprofit corporation named the Korean New Life Church. The articles of incorporation named six people to serve as the initial board of directors. As relevant here, Paragraph 4 of the articles of incorporation, the dissolution paragraph, provided

2

that upon any dissolution, the board of directors should distribute the church's assets to nonprofit charitable corporations, municipal corporations, or corporations for "the purposes of carrying on nonprofit charitable purposes."

¶ 5 Several months later, the board of directors passed a resolution stating that the church "shall join the Korean Methodist Church." The resolution also changed the local church's name from Korean New Life Church to Korean New Life Methodist Church. The church filed this name change with the Colorado Secretary of State.

¶ 6 The Korean Methodist Church (KMC) is a denomination based in Seoul, South Korea. A geographic subdivision of the denomination is the Korean Methodist Church of the Americas (KMCA). The parties dispute whether the KMCA is part of the KMC. The district court concluded that it need not resolve this dispute to decide the submission question. For purposes of our analysis, we presume that the KMCA is a geographic subdivision of the KMC, and we refer to the entities collectively as "the denomination."

¶ 7 The denomination is governed by rules provided in "The Doctrines, Book of Discipline and Rules of the Korea [sic] Methodist Church (2012)" (denomination rules). Among other things, the

3

denomination rules set forth the requirements for church membership, church property registration with the denomination, dues payments, mortgaging or selling local church property (which requires denomination permission and approval), selecting a church pastor, and general administrative control of the local church by the pastor.

¶ 8    The denomination rules also define offenses, disciplinary procedures, and church hierarchy.  The rules group local churches into districts, which are supervised and controlled by a district superintendent.  They also give the district superintendent the authority to terminate a local church's pastor.

¶ 9    As a nonprofit organization organized under Colorado law, the local church board enacted bylaws to govern the church's administration and activities.[1]  The bylaws provide for a "church board" comprising the pastor, the assistant pastor, elders, and selected deacons.  The bylaws contain no reference to the denomination or the denomination rules, but they provide the district superintendent with "approval" authority over the board's

---

[1] These bylaws are not dated but refer to the local church by its new name.

4

selection of a pastor. The bylaws are silent about the circumstances under which a pastor may be terminated.

¶ 10    The local church never amended its articles of incorporation to reflect the local church's new name, nor do the articles reference the denomination or its rules.

¶ 11    After changing its name, the local church never "registered" its property with the denomination.[2] Eventually, the local church sold its original property and purchased new property without the denomination's permission or approval. As well, the deeds conveying the property never mentioned the denomination, and the property was titled in the name of the local church. The local church later mortgaged the church property without receiving permission or approval from the denomination, and two board members signed as guarantors of the loan.

¶ 12    Additionally, the local church made nominal annual payments to the denomination to support the overall church mission, and the board passed resolutions placing the local church's financial decisions squarely under its control, contrary to the denomination

---

[2] Nothing in the record explains what "registration" means or the procedure necessary to accomplish it.

rules. As well, in December 2015, the board authorized two board members to sign on the church's bank accounts, and indicated that the "[p]astor will not be authorized to remove[] or add singers [sic]."[3]

¶ 13 Pastor Cha began working at the local church in 2014. In March 2018, a conflict with the board arose when he attempted to register the local church's property with the denomination and when he attempted to take control of the church's finances, contrary to the board's resolutions. The church board complained to the district superintendent about Pastor Cha's conduct, but the district superintendent concluded that the accusations were not supported by "admissible evidence."[4] In response to the board's continued protests, the district superintendent, acting on behalf of the denomination, fired the board members and authorized Pastor

---

[3] The undisputed record reveals that the local church took this action in response to problems with Pastor Cha's predecessor and that the board intended the pastor to focus on church administration and not finances.

[4] The record does not specify what the superintendent meant by "admissible evidence." We presume that the phrase refers to admissible evidence as determined by the denomination rules and not evidentiary rules of any jurisdiction.

Cha to install a new church board under the denomination's authority.[5]

¶ 14    In response, the old board resisted and passed resolutions terminating Pastor Cha and disassociating from the "Korean Methodist Church in the United States." It then filed this declaratory judgment and injunctive relief action asking the district court to declare that the old board was the lawful church board in control of the local church, including church property and church finances. The old board also requested injunctive relief to preserve the status quo and to bar Pastor Cha from the church property.

¶ 15    The parties eventually stipulated to a temporary restraining order to preserve the status quo, and the court entered the order in April 2018. This order established a sharing arrangement between the congregation members loyal to Pastor Cha, and the denomination and congregation members loyal to the old church board.

¶ 16    The district court conducted a preliminary injunction hearing in May 2018 and received briefing on whether to follow the polity

---

[5] The denomination characterized this action as the old board's resignation.

7

approach or the neutral principles approach. It heard conflicting testimony about whether the local church had submitted to the authority of the denomination. The founder and an original board member, Mr. Kim, testified that the local church always intended to manage its own affairs and had never submitted to the denomination's authority. He testified that he drafted the articles of incorporation and filed them with the secretary of state, and that he had never seen the denomination rules and was unfamiliar with them. He explained that the intent of the resolution changing the church's name was to support the mission of the Korean Methodist Church in South Korea, not to submit to its authority. And, he described the church's annual payment to the church in South Korea as charitable support of the church's mission, not a dues payment to the denomination.

¶ 17   In contrast, Mr. Ryhu, another original board member, testified that the intent of the resolution changing the church's name was to join the Korean Methodist Church in Seoul and that the KMCA later became a subdivision of the KMC. He recognized the authority of the denomination and said that the local church paid annual dues to the denomination, let the district

8

superintendent approve the selection of a pastor, and sometimes posted notices on the denomination's stationery.

¶ 18     The court also received documentary evidence, including the church's articles of incorporation, bylaws, resolutions, board minutes, real estate documents, and the denomination rules. It then issued a comprehensive oral order granting injunctive relief to the local church.

¶ 19     The district court first found that the operative question was whether the local church had submitted to the denomination's authority, because if it had, then, under the polity approach, a civil court could not interfere with the district superintendent's decision to oust the old board and to give Pastor Cha administrative and financial control of the local church, consistent with the denomination rules.[6] Relying on *Mote,* the court found that this submission question was an issue of corporate law that should be reviewed under neutral principles of law.

---

[6] In its complaint, the local church asserted that it had never submitted to the denomination's authority. In its counterclaim, the denomination asserted that the question of who should be the rightful pastor was one of church governance not subject to civil law.

9

¶ 20　Applying neutral principles, the court found insufficient evidence to show that the local church had submitted to the denomination's authority. It was not persuaded that the name change evidenced submission absent other changes or amendments to the articles of incorporation to conform to the denomination rules. It also noted that church property had never been registered with the denomination; that the local church had never sought permission or approval to buy, sell, or mortgage property; and that the local church's resolution vesting financial control in two church board members and prohibiting the pastor from having authority over financial accounts directly contradicted the denomination rules.

¶ 21　The district court also distinguished the present case from *Mote* by noting that the denomination could not point to any provision in the denomination rules "that directly addressed control over the local corporate entity."

¶ 22　The court ruled:

> [A]s a matter of corporate law, the old board, the status quo ante board and the status quo ante officers remain in place. The corporate entity has not submitted to the authority of the denomination based on the evidence I have

today.  The Court finds that Plaintiff [the old board] has a likelihood of success and substantial likelihood of success on the merits.

## B.    Procedural Posture

¶ 23    Following the preliminary injunction hearing and to avoid the expense of discovery and further litigation, the parties executed a written stipulation making the preliminary injunction order a permanent injunction order.  They agreed that the evidence presented at the preliminary injunction hearing sufficiently supported the court's order in favor of the local church, that those findings should be deemed a final judgment, and that neither party would challenge the sufficiency of the evidence on appeal.  They further agreed that each party could appeal whether the district court misapplied the law to the facts.  Finally, the parties stipulated that "neither party shall be awarded attorneys' fees or costs by the trial court."  The court accepted the stipulation and entered a final judgment under C.R.C.P. 65(a).  The denomination challenges the district court's decision to apply the neutral principles approach rather than the polity approach to the submission question, and its application of the neutral principles approach to the hearing facts to find there was no submission.  We perceive no error.

## II. Neutral Principles Apply to the Submission Question

¶ 24 The denomination contends that because the local church "joined" the KMC, everything that occurred thereafter, including Pastor Cha's attempts to take control of the church, install a new board, and register church property with the denomination, relates to church governance. It argues that because the First Amendment and the polity approach shield church governance issues from civil court review, the district court's application of *Mote*'s neutral principles "interfer[ed] with the internal church governance of the Korean New Life Methodist Church."

¶ 25 The local church responds that the district court correctly applied *Mote* because this is a dispute over church property, to which neutral principles apply, not church governance. We conclude that the only question properly before us concerns the meaning of "join" and whether the local church submitted to the denomination's authority. For the reasons described below, we affirm the district court's judgment.

### A. Standard of Review and Preservation

¶ 26 Review of a permanent injunction order presents a mixed question of law and fact. *Dallman v. Ritter*, 225 P.3d 610, 620-21

12

(Colo. 2010).  We review the court's factual findings for clear error and defer to those findings when they are supported by the record. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383–84 (Colo. 1994); *Rome v. Mandel*, 2016 COA 192M, ¶ 60.  We review questions of law de novo.  *Evans v. Romer*, 854 P.2d 1270, 1274 (Colo. 1993).

¶ 27    A party seeking a permanent injunction must show (1) actual success on the merits;[7] (2) irreparable harm if the injunction is not entered; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) an adverse public interest if the injunction is denied.  *See Dallman*, 225 P.3d at 62; *Langlois v. Bd. of Cty. Comm'rs*, 78 P.3d 1154, 1157 (Colo. App. 2003).  Because the parties only dispute the first factor — success on the merits — we do not address the remaining factors.

¶ 28    Initially, we must decide whether the church governance issue was preserved for our review.  During its oral ruling, the district court stated, "I have not decided and have not had to decide today who is the pastor.  I don't have to decide whether — today whether

---

[7] A preliminary injunction requires a showing of a likelihood of success on the merits, which the court found.

the board has the authority to fire the pastor . . . ."  Nothing in the record shows that the denomination sought the district court's ruling on this issue.  Nor did the denomination choose to appeal the preliminary injunction ruling.  Further, we discern no record evidence that the denomination sought a ruling on the local church's authority to fire the pastor and install a new board before the court entered a final judgment pursuant to the parties' stipulation.  Under these circumstances, we conclude that the church governance issue was not preserved, and we address only the court's ruling on the submission question.  *See Rinker v. Colina-Lee*, 2019 COA 45, ¶ 25 ("As a general rule, a party must make a timely and specific objection or request for relief in the district court to preserve an issue for appeal.").

### B.    Relevant Law

¶ 29    The First Amendment to the United States Constitution prohibits any "law respecting an establishment of religion or prohibiting the free exercise thereof."  U.S. Const. amend. I; *see also Moses v. Diocese of Colo.*, 863 P.2d 310, 319 (Colo. 1993).  It includes an absolute freedom to believe and a qualified freedom to act.  *Moses*, 863 P.2d at 319.  To protect a religious group's freedom

14

to preserve its beliefs or practices, courts apply two approaches when resolving church disputes.

¶ 30    First, courts generally recognize a "doctrine of judicial abstention in matters involving court interpretation of ecclesiastical law." *Id.* (citing *Watson v. Jones*, 80 U.S. 679 (1871)). This polity approach stems from the legal principle that all persons have "the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights." *Watson*, 80 U.S. at 728. When a church submits to a religious association or body, it impliedly consents to the ecclesiastical government of the association and is bound by its authority. *Id.* at 729. Any decisions of these ecclesiastical bodies and their tribunals are subject only to appeals that the "organism itself provides for." *Id.* Thus, civil courts must defer to such bodies' rulings on ecclesiastical matters and may not inquire into whether the church judicial body properly followed its own rules of procedure. *Serbian*, 426 U.S. at 720, 724.

¶ 31    Under the second approach — neutral principles — civil courts may provide a forum for determining the ownership of church

property so long as they refrain from resolving such disputes "on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602 (1979).  Indeed, a state is free to adopt a procedure for resolving church property disputes "so long as it involves no consideration of doctrinal matters" such as "the ritual and liturgy of worship or the tenets of faith."  *Id.* (quoting *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970)).

¶ 32    When resolving disputes over the ownership and control of church property, our supreme court has adopted the neutral principles approach.  *Mote*, 716 P.2d at 96.  Under this approach, the court first determines whether instruments of conveyance, church documents, and "other relevant evidence establish that the general church has rights of ownership or control over the disputed church property by reason of a trust, a reverter clause, or some other basis."  *Id.* at 99.  If, after applying these neutral principles, the court determines that ownership or control belongs to the general church, then "there will be no need to assess how property of the local church is controlled."  *Id.*  However, if the court determines that ownership or control of the disputed property

16

belongs to the local church, "it then may be necessary to determine how control over that property is to be exercised." *Id.*

¶ 33　　The polity and neutral principles approaches are not mutually exclusive. Applying neutral principles is always subject to the broad caveat that civil courts have no subject matter jurisdiction to resolve a dispute that is "strictly and purely ecclesiastical in its character . . . [such as] a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 733; *see, e.g., Moses*, 863 P.2d at 319-20 (citing cases).

### C.　Application

¶ 34　　Both parties agree that the local church was formed independently of the denomination. But they dispute whether the local church later submitted to the denomination's authority and how that question should be analyzed. *Mote* answers these questions.

¶ 35　　The dispute in *Mote* arose from a doctrinal change that caused the majority of the local church's members to secede from the denomination. *Mote*, 716 P.2d at 89. The minority members, loyal

to the denomination, brought an action to determine who had legal rights to the church property. *Id.* at 87.

¶ 36   The trial evidence established that the local church was incorporated under Colorado law and that legal title to the church's real and personal property was held by the corporate entity. *Id.* at 88. The founders' affidavit said the original members had unanimously decided to organize under the Colorado diocese, a geographical unit of the national denomination. *Id.* In later resolutions, the local church acceded to the constitutions of the national denomination, recognized the authority of the national denomination, and promised obedience to the canons of the national denomination. *Id.* Consistent with denomination rules, the local church then amended its articles of incorporation to say that the local church could not incur indebtedness that might encumber church property without the written consent of the denomination. *Id.* The amendments reaffirmed the local church's accession to the denomination's rules and authority. *Id.* The doctrinal change provoking the secession occurred more than two decades later, after which the denomination's executive council

18

issued a resolution refusing to recognize the validity of the secession. *Id.* at 89.

¶ 37 Relying on this last resolution, the trial court applied the polity approach to find that it could not interfere with this religious decision and that the property belonged to the denomination. *Id.* A division of this court reversed and concluded that the proper procedure for deciding this issue was the neutral principles approach. *Id.* at 90. As part of that approach, the division adopted a "presumptive rule of majority representation" for church property disputes. It then examined the record only to determine whether the majority members of the local church had created an express trust over the property in favor of the denomination. *Id.* Finding no such express trust, the division concluded the property belonged to the majority members of the local church. *Id.*

¶ 38 The supreme court rejected the majority representation rule, but it agreed with the division's decision to apply neutral principles of law. The court traced this approach through United States Supreme Court precedent, noting that states are free to adopt neutral principles of law to resolve church property disputes so long as the analysis involves no consideration of doctrine. *Id.* at 94. It

19

recognized the Supreme Court's "clear preference for the neutral principles approach" because this approach is completely secular, is flexible enough to accommodate all forms of religious organization, and relies on objective, well-established and widely-known trust and property laws. *Id.* at 94-95 (citing *Wolf*, 443 U.S. at 603-04). Moreover, it noted that churches may determine and document the disposition of church property in advance of any dispute according to church members' intent — a minimal burden. *Id.* at 95.

¶ 39    Finally, relying on its previous holding in *Horst v. Traudt*, 43 Colo. 445, 448, 96 P. 259 (1908), that religious corporations "are subject to the principles of the common law and the practice and procedure applicable to corporations under the general incorporation laws," the supreme court was persuaded that it "should analyze legal issues that arise out of church organizations in the same manner as [it] would analyze those issues if they arose out of any other corporation or voluntary association." *Mote*, 716 P.2d at 99.

¶ 40    As well, another division of this court has held that neutral principles may be "applied to disputes touching upon religious

conflicts that do not involve the disposition of church property."
*Wolf v. Rose Hill Cemetery Ass'n*, 914 P.2d 468, 471 (Colo. App. 1995).

¶ 41 With these principles in mind, we conclude that the question of submission does not involve a "religious dispute" covering ecclesiastical matters or involving church doctrine. *See St. John Chrysostom Greek Catholic Church of Pittsburgh v. Elko*, 259 A.2d 419, 424-25 (Pa. 1969) (concluding that a court's resolution of whether a local church was part of the denomination or independent of any church hierarchy is a factual matter that does not require it to consider the significance and relevance of church doctrine). Rather, it involves an inquiry into the local church's organizational intent as evidenced by church documents, testimony, and conduct. *Id.* at 421-24. And, just as we discern corporate intent from the corporation's organizing documents and board actions, we may discern a local church's intent by considering "instruments of conveyance, church documents and other relevant evidence" bearing on the local church's intent. *Mote*, 716 P.2d at 99; *see McCoy v. Pastorius*, 125 Colo. 574, 581, 246 P.2d 611, 615 (1952) (concluding that a board's resolution gave a

21

corporation's president "complete authority" to enter into an agreement).

¶ 42     Similar cases from other jurisdictions support our conclusion. *See Belin v. West,* 864 S.W.2d 838, 841 (Ark. 1993) (explaining that "if a dispute involving a church can be resolved without addressing ecclesiastical questions, the First Amendment does not prohibit consideration by the civil courts"); *Diocese of San Joaquin v. Gunner,* 202 Cal. Rptr. 3d 51, 62 (Cal. Ct. App. 2016) (noting that civil courts may consider deeds, a local church's articles of incorporation, the general church's constitutions, canons, and rules and relevant statutes including those concerning religious property to resolve a property dispute "that does not turn on questions of church doctrine"); *Draskovich v. Pasalich,* 280 N.E.2d 69, 72 (Ind. Ct. App. 1972) (explaining that courts may look at ecclesiastical documents and related evidence concerning religious doctrine "for the limited purpose of determining the nature of the church organization"); *Nolynn Ass'n of Separate Baptists in Christ v. Oak Grove Separate Baptist Church,* 457 S.W.2d 633, 634 (Ky. 1970) (accepting jurisdiction to decide whether a local church had withdrawn from the denomination); *St. John Chrysostom Greek*

22

*Catholic Church*, 259 A.2d at 255-56 (affirming lower court's conclusion that the local church submitted to the denomination's authority based on sufficient record support); *Malanchuk v. St. Mary's Greek Catholic Church of McKees Rocks*, 9 A.2d 350, 399-400 (Pa. 1939) (affirming lower court's conclusion that the local church intended to remain independent of the denomination based on sufficient record support); *Diocese of Galveston-Houston v. Stone*, 892 S.W.2d 169, 176-77 (Tex. App. 1994) ("So long as there is no involvement in resolving underlying controversies over religious doctrine, civil courts may resolve church disputes over property.").

¶ 43     Accordingly, we discern no error in the district court's decision to apply neutral principles of law to the submission question.

### III.   No Submission Occurred

¶ 44     Having concluded that neutral principles of law should be applied to decide the submission question, we next consider the denomination's assertion that the court erroneously applied that law to the evidence.

### A.   Standard of Review

¶ 45     We review the trial court's application of neutral principles on the submission question for clear error.  We set aside such

decisions by the trial court only when the record lacks any competent evidence to support such decisions. *Bd. of Cty. Comm'rs v. Conder*, 927 P.2d 1339, 1343 (Colo. 1996).

## B. Analysis

¶ 46    The denomination relies heavily on Mr. Ryhu's status as an original board member and his testimony that the local church intended to submit to the denomination when it changed its name. But recall, the local church's founder and original board member Mr. Kim contradicted Mr. Ryhu's testimony. In the end, the district court placed little weight on Mr. Ryhu's testimony, and we may not second-guess or alter that decision. *See Mariani v. Rocky Mountain Hosp. & Med. Serv.*, 902 P.2d 429, 436 (Colo. App. 1994) (resolution of witness credibility and the weight given to a witness's testimony are "the sole responsibility of the trial court," and we will not reverse the trial court's findings on appeal if there is record support for those findings), *aff'd*, 916 P.2d 519 (Colo. 1996).

¶ 47    Instead, the court relied on the local church's articles of incorporation, bylaws, resolutions, board meeting minutes, property conveyance actions, and the denomination rules, all of which support its conclusion that the local church did not submit to the

denomination's authority. *See St. Michael & Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 259 A.2d 862, 864 (Pa. 1969) (Reviewing the corporate charter revealed that the local church was founded as a constituent part of the Russian Orthodox Church because the local church "acknowledges itself to be a member and to belong to the Russian Orthodox Greek Catholic Church in the No[r]th America Diocese and as such, it accedes to, recognizes, and accepts the Constitution, Canons, Doctrines, Discipline and Worship of the Russian Orthodox Greek Catholic Church in the Diocese of North America and acknowledges their authority accordingly"); *see also Protestant Episcopal Church v. Barker*, 171 Cal. Rptr. 541, 554 (Cal. Ct. App. 1981) (recognizing that the resolution of church property disputes turns on the unique facts of each church's organizational structure); *Borgman v. Bultema*, 182 N.W. 91, 95 (Mich. 1921) (examining a local church's incorporation act and concluding that the act required "conformity to the faith and constitution or form of government as adopted by the" denomination).

¶ 48     First, in contrast to *Mote*, the church's bylaws and articles of incorporation do not reference the denomination or its rules.  Nor

25

does either document expressly provide that the local church will abide by the denomination rules. And neither document has been amended to recognize the denomination or its authority over local churches since the local church was formed.

¶ 49 Next, the bylaws and resolutions placed the church's financial control in two designated board members, contrary to the denomination rules vesting "administrative" authority in the pastor and making the pastor responsible for "church administration in general." Importantly, the record shows that Pastor Cha was a board member in 2015 when the board made this decision, yet he never voiced an objection to it or raised the denomination rules as a bar to it, either then or at any time before March 2018. *See Oak Grove*, 457 S.W.2d at 634 (concluding that evidence showed the local church "attended to its own affairs, handled its own finances and selected its own church officials").

¶ 50 As well, we are not persuaded that the bylaws' inclusion of "district superintendent" approval of a pastor evidences submission to the denomination's authority, because Paragraph 3(b) of the bylaws vests the power to nominate a pastor in the church board, after consultation and approval by the district superintendent. In

26

our view, this supports the district court's finding that the district superintendent did not possess the independent authority to nominate or install a pastor without the church board's participation, but merely gave the district superintendent "veto authority" over the board's selection, a "narrow act of obeisance" as opposed to a "general act of obeisance to the denomination."

¶ 51  We are similarly unconvinced by the denomination's assertion of "numerous acts where the members and leaders of the [local church] acted in full connection with the [denomination]." The denomination asks us to weigh these facts more heavily than the district court did to find in its favor, an action not within our province as an appellate court. *See Van Cise, Phillips & Goldberg v. Jelen*, 197 Colo. 428, 430, 593 P.2d 973, 974 (1979) ("[A]n appellate court will neither weigh the evidence nor appraise the credibility of witnesses, this determination will not be disturbed on review.").

¶ 52  We also conclude that the record supports the district court's finding that the local church managed its property independently of and contrary to the denomination's rules. *See Indep. Methodist Episcopal Church v. Davis*, 74 A.2d 203, 208-09 (Conn. 1950) (deferring to a trial court's finding that the local church did not

27

surrender its autonomy to the general church because it reserved the right to control its own property, even though it "followed the spiritual guidance and leadership" of the general church).

¶ 53 The record reveals that the local church bought and sold at least two properties before purchasing the existing property, but that it had never notified or sought approval from the denomination for any of these transactions. Moreover, the record shows that the local church mortgaged its existing property, again without notification to or approval from the denomination. And, the local church never registered the property with the denomination, contrary to the denomination rules.

¶ 54 Finally, the dissolution paragraph in the articles of incorporation, which vests the church board (not the denomination) with the authority to charitably distribute church property upon dissolution, supports the court's finding that the local church did not submit to the denomination. *Compare Guardian Angel Polish Nat'l Catholic Church of Los Angeles, Inc. v. Grotnik*, 13 Cal. Rptr. 3d 552, 561 (Cal. Ct. App. 2004) (applying presumption of a trust because the articles of incorporation did not include an express provision governing the distribution of assets in the event of a

28

dissolution), *with Barker*, 171 Cal. Rptr. at 554 (concluding no express trust was created by the articles of incorporation because the articles "say nothing about disposition of church property on dissolution of the corporation").

¶ 55     For these reasons, we discern no clear error in the district court's application of the neutral principles approach to the evidence and affirm the judgment. *See Rome*, ¶ 60.

## IV.  Attorney Fees

¶ 56     The local church requests appellate attorney fees and costs based on its assertion that the denomination's argument is "directly contrary the Colorado Supreme Court's decision in *Mote*" and is therefore substantially frivolous, groundless, or vexatious under section 13-17-102, C.R.S. 2019. We disagree because as explained above, the question here is one of first impression. As well, the parties stipulated that neither party shall be awarded attorney fees. Therefore, we deny the request.

## V.  Conclusion

¶ 57     The judgment is affirmed.

JUDGE TAUBMAN and JUDGE PAWAR concur.